Reggie WHITE, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc.; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; The Dallas Cowboys Football Club, Ltd.; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; The New Orleans Saints Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; The Philadelphia Eagles Football Club, Inc.; B & B Holdings, Inc.; Pitts-

burgh Steelers Sports, Inc.; The Chargers Football Company; The San Francisco Forty–Niners, Ltd.; The Seattle Seahawks, Inc.; Tampa Bay Area NFL Football Club, Inc.; and Pro–Football, Inc., Defendants.

Civ. No. 4–92–906.

United States District Court, D. Minnesota, Fourth Division.

Aug. 19, 1993.

Edward M. Glennon, Carol T. Rieger, Charles J. Lloyd, Lindquist & Vennum, Minneapolis, MN, and James W. Quinn, Jeffrey L. Kessler, Jonathan T. Weiss, Daniel Rubin, David G. Feher, and Cathy E. Shore–Sirotin, Weil, Gotshal & Manges, New York City, for plaintiffs.

James Fitzmaurice, Daniel J. Connolly, Faegre & Benson, Minneapolis, MN, Herbert Dym, Gregg H. Levy, Covington & Burling, Washington, DC, and Frank Rothman, Shepard Goldfein, and William L. Daly, and Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for defendants.

Peter S. Hendrixson, Dorsey & Whitney, Minneapolis, MN, and Maxwell M. Blecher, Blecher & Collins, Los Angeles, CA, for defendant Philadelphia Eagles Football Club, Inc.

DOTY, District Judge.

This matter is before the court on the following motions:

1. A motion by the named plaintiffs to amend the Stipulation and Settlement Agreement in the present action;

2. A motion by the named plaintiffs and defendants, other than the Philadelphia Eagles [1], for final approval of the Stipulation and Settlement Agreement as modified by the various amendments agreed to by the parties;

3. A motion by the named plaintiffs and defendants, other than the Philadelphia Eagles, for entry of various factual findings concerning the reconstitution and recognition of the National Football League Players Association ("NFLPA") as a labor union and the application of the nonstatutory labor exemption to various terms of a recently executed collective bargaining agreement; and

4. A motion by the named plaintiffs to sanction the Philadelphia Eagles.

Based on a review of the file, record and proceedings herein, the court grants the motion to amend the Stipulation and Settlement Agreement, grants final approval of the amended version of the Stipulation and Settlement Agreement, denies plaintiffs' motion for sanctions, overrules all objections, grants the motion for further factual findings and makes the findings set forth below.

BACKGROUND [2]

This antitrust action was filed on September 21, 1992, less than two weeks after a jury rendered its verdict in *McNeil v. National Football League*, 1992–2 Trade Cas. (CCH) ¶ 69,982, 1992 WL 315292 (D.Minn. Sept. 10, 1992) (special verdict).[3] The five named plaintiffs [4] brought the present action on behalf of:

(i) all players who have been, are now, or will be under contract to play professional

1. The Philadelphia Eagles purport to object to the various motions before the court. Thus, when discussing those motions, the terms "defendants" and "parties", unless otherwise indicated, do not include the Philadelphia Eagles.

2. The history of the present action and various other lawsuits involving players and the National Football League is more fully set forth in the court's opinion of April 30, 1993. *White v. National Football League*, 822 F.Supp. 1389 (D.Minn.1993).

3. In *McNeil*, eight individual football players whose contracts with their National Football League ("NFL") employers expired on February 1, 1990, brought an action alleging, inter alia, that the NFL's right of first refusal/compensation rules, as set forth in Plan B, violate Section 1 of the Sherman Act.

4. Those players are: Reggie White, Michael Buck, Hardy Nickerson, Vann McElroy and Dave Duerson.

football for an NFL club at any time from August 31, 1987 to the date of final judgment in this action and determination of any appeal therefrom, and (ii) all college and other football players who, as of August 31, 1987, to the date of final judgment in this action and the determination of any appeal therefrom, have been, are now, or will be eligible to play football as a rookie for an NFL team.

(Pls.' Second Am.Compl. at 8.)

The *White* complaint, which originally sought only injunctive relief, was amended to seek both antitrust damages and injunctive relief stemming from the operation of the right of first refusal rules of Plan B, the college draft, the NFL Player Contract and the preseason pay rules.[5] Defendants, the NFL and its twenty-eight member clubs, answered the complaint, denying all of plaintiffs' material allegations and asserting various affirmative defenses and counterclaims.

On January 6, 1993, the parties, with the assistance of this court, reached a tentative agreement to settle the present action. By order dated January 6, 1993, as amended and reaffirmed on February 17, 1993, the court certified, for the purposes of settlement, a damages and injunctive relief class pursuant to Federal Rule of Civil Procedure 23(b)(1) consisting of:

(i) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987 to the date of final approval of the settlement of this action and the determination of any appeal therefrom, and (ii) all college and other football players who, as of August 31, 1987, through the date of final approval of the settlement of this action and the determination of any appeals therefrom, have been, are now, or

will be eligible to play football as a rookie for an NFL team.

*See White v. National Football League,* Civ. No. 4–92–906, slip op. (D.Minn. Jan. 6, 1993) (entered *nunc pro tunc* ); *White v. National Football League,* Civ. No. 4–92–906, slip op. (D.Minn. Feb. 17, 1993).

On February 26, 1993, plaintiffs and defendants entered into a Stipulation and Settlement Agreement ("the original Settlement Agreement") which set forth the terms of the settlement as originally proposed. The Settlement Agreement was designed to bring an end to both the present action and a wide range of related cases.[6]

In an order dated February 26, 1993, this court granted preliminary approval of the original Settlement Agreement. *See White v. National Football League,* Civ. No. 4–92–906, slip op. at 2–3 (D.Minn. Feb. 26, 1993). Pursuant to Federal Rule of Civil Procedure 23(e), the court ordered plaintiffs, at their own expense, to send written notice by mail to class members.[7] The court also ordered plaintiffs to publish a summary notice in *USA Today.* The notices, the contents of which were approved by the court, described the terms of the proposed settlement and informed all class members that a final approval hearing would be held on April 16, 1993, to determine whether the proposed settlement was fair, reasonable and adequate. The notices also informed class members that they had a right to submit written objections and to appear at the final approval hearing, in person or by counsel, to be heard in support of, or in opposition to, the settlement, or make any other statement of their position concerning the settlement. *See id.*

In a class of more than 5,000 players, objections to the original Stipulation and Set-

---

**5.** The second amended complaint also alleges that defendants illegally fixed players' medical insurance benefits and tortiously interfered with players' prospective contracts.

**6.** As the court noted in its order of April 30, 1993:

Those mandatory class certification orders have provided a vehicle for the settlement of, among other things, all player challenges to the Plan B veteran player reservation rules, the college draft and the preseason pay rules.

*White,* 822 F.Supp. at 1395.

For many years, those and other player rules have been the source of numerous disputes between players and the NFL. *See id.* at 1394 n. 2, 1416 n. 36 (listing various player disputes).

**7.** On March 12, 1993, plaintiffs mailed notice to 4,957 class members who are current or former NFL players. During the week of March 8, 1993, plaintiffs mailed notices to 343 college players who attended the 1993 NFL Rookie Combine.

tlement Agreement were filed on behalf of seventy-three active or former NFL players.[8] In addition, objections to the original settlement were filed on behalf of one NFL member club, the Philadelphia Eagles, sixteen college players,[9] and one player agent.[10]

On April 16, 1993, the court held a final approval hearing on the original Stipulation and Settlement Agreement. The court heard arguments by counsel and class members both in support of and in objection to the proposed settlement. The court also heard testimony of various witnesses concerning the proposed settlement.[11] By order dated April 30, 1993, the court certified a mandatory settlement class pursuant to Federal Rule of Civil Procedure 23(b)(1), overruled all objections and granted final approval of the settlement. *White v. National Football League*, 822 F.Supp. 1389 (D.Minn.1993). In so ruling, the court specifically found that:

(a) The terms of the Stipulation and Settlement Agreement fundamentally modify the NFL's rules, policies and practices regarding veteran player movement and employment. The settlement also fundamentally modifies by agreement the college draft, the NFL Player Contract, and various other terms and conditions of NFL player employment.

(b) The revised player mobility and employment rules represent a successful effort by NFL players to eliminate Plan B, and to bring about substantial modifications in the principles relating to veteran player transfers.

---

**8.** As of the deadline for filing objections to the original Stipulation and Settlement Agreement, April 2, 1993, the following active or former NFL players had filed objections: Wilber Marshall, Paul Gruber, Brian Washington, Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Mike Farr, Pepper Johnson, Don Beebe, Gregory Scales, Gregory J. Baty, Barry Sanders, Luis Sharpe, Steve Atwater, Horatio Benny Blades, James Hasty, Byron Evans, Michael C. Johnson, Reggie Langhorne, Maurice Hurst, John Fourcade, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, John Elliott, Duane Bickett and Steve Young.

After the April 2, 1993 deadline, additional objections to the original Stipulation and Settlement Agreement were filed on behalf of Brian Blades, Roland James, Pat Carter, Kenneth F. Ruettgers, Jerry Ball, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever.

At the hearing for final approval of the original Stipulation and Settlement Agreement, the court granted all motions to extend time, ruling that all objections filed as of the hearing date, April 16, 1993, would be considered by the court, whether such objections were timely filed or not. The court further ruled that April 16, 1993, was the deadline for objections to the original version of the Stipulation and Settlement Agreement, and that it would not consider any objections filed after that date.

On February 10, 1993, the *Tice* action, another case involving preseason claims, was transferred from the District of Columbia to this court by order of Judge Royce C. Lamberth. *Tice v. Pro Football, Inc.*, 812 F.Supp. 255 (D.D.C.1993); *Tice*, 812 F.Supp. 255 (D.Minn. transferred Feb. 10, 1993). At the preliminary approval hearing, some of the *Tice* plaintiffs objected to the settlement of the preseason pay claims within the context of *White*. Those objections were withdrawn for purposes of final approval of the original Settlement Agreement, although a few players have filed individual objections to the settlement of the preseason pay within the scope of the *White* class action. (See, e.g., Letter from Gregory J. Baty to the court dated March 31, 1993) ("the *Tice* case regarding preseason pay claims should not have been included in any Reggie White settlement").

**9.** One college player, Brian Pressler, filed a timely objection to the original Stipulation and Settlement Agreement, purportedly on behalf of himself and all other present and future "college and other football players" similarly situated.

Untimely objections to the original Agreement were filed on behalf of college players Jesse Becton, Scott Brown, Rudy Thompson, Ernie Lewis, Eugene Brown, Percy Coleman, James Chinn, Ron Alexander, Brad LaCombe, Dan Purcell, Steve Ross, Ron Moran, Steve Robinson, Garrett Washington and Bennie Hargro.

None of the foregoing college players were drafted in the 1993 College Draft or signed contracts with any NFL club for the 1993 season.

**10.** Robert J. Sheridan, who represents the sixteen college player-objectors, filed the objection purportedly on behalf of himself, and all other present and future agents and attorney-agents similarly situated.

**11.** Any person who wanted to argue or testify was permitted to do so.

(c) Under Eighth Circuit law, when evaluating the present Settlement Agreement, it is unnecessary for the court to determine whether every provision of the settlement, if adopted outside a settlement context and made subject to a trial on the merits, would be deemed reasonable after a full rule of reason inquiry. In fact, the court should not make such inquiry.

(d) The Settlement Agreement, as a whole, is not *per se* illegal.

(e) The court overrules all objections for the reasons previously set forth, and concludes that the overall agreement is fair, reasonable and adequate to the class.

*Id.* ¶ 7.29, at 1431–32. The court further concluded that class members had been properly notified of the proposed class certification and the terms of the original settlement, *id.* § I, at 1399–1402, and that due process did not require that absent class members be given the right to opt out of the *White* class. *Id.* § III, at 1410–12.[12]

**12.** The court also permitted various objectors to intervene solely for purposes of preserving their right to appeal, *id.* § VIII, at 1432–33, and granted defendants' motions to permanently enjoin various other lawsuits. *Id.* § IX, at 1433–35.

**13.** However, the 1982 Collective Bargaining Agreement provided that the provisions concerning the college draft would not expire until "at least 1992". *See* 1982 Collective Bargaining Agreement art. XIII, § 1 ("Commencing with the college draft to be held on or about May 1, 1983, and with respect to the college draft to be held on or about May 1 each year thereafter, through at least 1992, the following principles will apply. . . .").

**14.** As this court previously noted:

The nonstatutory labor exemption . . . exempts certain anticompetitive union-employer activities from antitrust sanctions. The Supreme Court has recognized that in order to properly accommodate the congressional policy favoring free competition in business markets with the congressional policy favoring collective bargaining under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, certain union-employer agreements must be accorded a limited nonstatutory exemption from antitrust sanctions.

Generally, whether the nonstatutory exemption will protect a particular agreement turns upon whether the relevant federal labor policy is deserving of preeminence over federal anti-

In addition to its rulings concerning the settlement itself, the court also made various findings concerning the status of the NFLPA in its order dated April 30, 1993. In August 1987, the last collective bargaining agreement between players and defendants expired ("the 1982 Collective Bargaining Agreement").[13] In *Powell v. National Football League,* a class action in which players sought to challenge, inter alia, a predecessor of the Plan B veteran player restraints, the Eighth Circuit determined that the nonstatutory labor exemption[14] would continue to protect NFL veteran player rules from antitrust scrutiny after the expiration of a collective bargaining agreement as long as an "ongoing collective bargaining relationship" existed between the players and the NFL. 888 F.2d 559, 568 (8th Cir.1989), *superseded by,* 930 F.2d 1293, 1303 (8th Cir.1989), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991).[15] The Eighth Circuit did not, however, specify at what point the exemption would end, or what actions would be required to terminate the collective bargain-

trust policy under the circumstances of the particular case.
*Powell v. National Football League,* 678 F.Supp. 777, 782 (D.Minn.1988) (citations omitted), *rev'd on other grounds,* 888 F.2d 559, 568 (8th Cir. 1989), *superseded by,* 930 F.2d 1293, 1303 (8th Cir.1989), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991); *see generally* Daniel J. Gifford, *Redefining the Antitrust Labor Exemption,* 72 Minn.L.Rev. 1379, 1404–08 (1988) (detailing history of the nonstatutory labor exemption); Note, *Releasing Superstars from Peonage: Union Consent and the Nonstatutory Labor Exemption,* 104 Harvard L.Rev. 874, 875–78 (1991) (discussing genesis of the exemption).

**15.** In reaching that result, the Eighth Circuit overturned this court's ruling that the nonstatutory labor exemption terminates when the parties reach impasse on a particular term or condition of employment. *See Powell,* 678 F.Supp. at 786–89 (holding that exemption terminates at impasse); *McNeil v. National Football League,* 790 F.Supp. 871, 881–84 (D.Minn.1992) (discussing the history of this court's rulings in *Powell* on the scope of the nonstatutory labor exemption); *see generally* Jonathan S. Shapiro, Note, *Warming the Bench: The Nonstatutory Labor Exemption in the National Football League,* 61 Fordham L.Rev. 1203, 1218–27 (1993) (discussing Eighth Circuit's reversal of this court's determination that impasse was the proper termination point for the exemption, exploring the merits of various termination points and concluding that impasse represents the "best solution").

ing relationship. *Powell*, 930 F.2d at 1303 ("Upon the facts currently presented by this case, we are not compelled to look into the future and pick a termination point for the labor exemption.")

In light of the Eighth Circuit's decision in *Powell*, players and the NFLPA sought to terminate the collective bargaining relationship so that players would be free to pursue their antitrust claims. This court, in its order of May 23, 1991, determined that various actions taken by the players and the NFLPA resulted in the termination of the NFLPA's "status as a labor organization" sometime in November or December of 1989. *Powell v. National Football League*, 764 F.Supp. 1351, 1356 (D.Minn.1991) (holding only in *McNeil*); *see Pittsburgh Steelers, Inc.*, No. 6–CA–23143, 1991 WL 144468, at *4 (June 26, 1991) (opinion by the Associate General Counsel of the NLRB finding that "the NFLPA has effectively disclaimed its representational rights and has converted itself from a Section 2(5) labor organization to a trade association"). On June 12, 1991, the Eighth Circuit denied defendants' motion for interlocutory appeal of this court's determination in *McNeil* that the NFLPA had ceased to function as a labor union. *McNeil*, No. 91–8088 (8th Cir. June 12, 1991). As a result, eight individual players were able to pursue their antitrust claims in *McNeil*.

After the parties reached a tentative global settlement, the Board of the NFLPA passed a resolution seeking to again become the collective bargaining representative of the players.[16] In mid-January 1993, the NFLPA began to collect authorization cards from NFL players designating it as their exclusive collective bargaining representative.

By letter dated March 23, 1993, the NFLPA informed the NFL that:

[a] majority of the players on 1992 season-ending rosters have now signed cards authorizing the NFLPA to represent them for purposes of collective bargaining.

(Letter from Richard A. Berthelsen to Paul Tagliabue dated March 23, 1993.) After an independent entity, the American Arbitration Association, confirmed the authenticity of the cards, the NFL voluntarily recognized the NFLPA as the exclusive collective bargaining representative of the NFL players. (Letter from Harold Henderson to Eugene Upshaw dated March 29, 1993.)

On March 31, 1993, the NFLPA and representatives of the NFL Management Council, the multi-employer bargaining unit of the NFL owners, began negotiating in an effort to reach a new collective bargaining agreement. Those negotiations remained ongoing as of April 30, 1993, the date on which the court granted final approval of the original Stipulation and Settlement Agreement. *White*, 822 F.Supp. at 1397 n. 9.

In the order of April 30, 1993, the court made the following findings concerning the NFLPA:

(1) The NFLPA has been lawfully formed and selected by the players to serve as the exclusive collective bargaining representative of all present and future NFL players.

(2) Neither the NFL nor any of its members have taken any action which in any way hindered or supported the formation of the NFLPA as the exclusive collective bargaining representative of all present and future NFL players.

(3) The NFL and its member clubs have lawfully recognized the NFLPA as the players' exclusive collective bargaining representative.

(4) Accordingly, the NFLPA is fully authorized and empowered to enter into a new collective bargaining agreement with the NFL and its member clubs.

*Id.* ¶ 10.7, at 1435–36.

The original Settlement Agreement anticipated that the parties might reach a new collective bargaining agreement which incorporated those player movement rules set forth in the Settlement Agreement. The court did not enter final judgment on its order of April 30, 1993, because the parties were still attempting to negotiate such an agreement.

On May 6, 1993, the NFLPA and the NFL reached agreement on the terms of a new

---

16. The NFL defendants still maintain that the NFLPA has never ceased to function as the play-ers' bargaining representative, and thus the non-statutory labor exemption has never ended.

collective bargaining agreement (hereinafter "the Collective Bargaining Agreement"). On that date, the parties to various lawsuits involving the NFLPA's group licensing program also reached final agreement on the terms of a settlement of those group licensing cases. As a result of those negotiations, the parties also agreed to amend various provisions of the Stipulation and Settlement Agreement, and plaintiffs moved the court to approve those amendments ("the proposed amendments"). The parties also made a joint motion requesting that the court reconfirm its prior findings and make further factual findings concerning the NFLPA's status and the scope and applicability of the non-statutory labor exemption ("the requested findings").

The court held another preliminary hearing on June 1, 1993, to determine whether the proposed amendments to the Settlement Agreement and the requested findings fell within the range of possible approval, and whether the proposed notice and method by which notice would be given satisfied the requirements of due process. The court heard arguments both in support of and opposition to the pending motions.[17] On June 2, 1993, the court preliminarily approved the proposed changes, scheduled a final settlement hearing for July 7, 1993, and ordered that notice of the proposed changes and date of the final hearing be provided to the class.[18] *White v. National Football League,* Civ. No. 4–92–906, slip op. at 6–7 (D.Minn. June 2, 1993).[19] The order further required that any class member wishing to appear at the final settlement hearing file notice of such intent, along with any papers setting forth the class member's position concerning the pending motions, by June 22, 1993. *See id.* at 7–8.

As of July 7, 1993, the date of the final settlement hearing, twenty-eight players, all of whom had previously objected to the terms of the original Stipulation and Settlement Agreement, filed objections to the motions currently before the court.[20] One de-

---

**17.** All those who had previously objected to the original Stipulation and Settlement Agreement were notified of the preliminary approval hearing on June 1, 1993. Representatives of the following objectors were present at that hearing: Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Don Beebe, Gregory Scales, Byron Evans, Paul Gruber, Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever. Counsel for the Philadelphia Eagles was also present.

At the hearing, all persons who requested the opportunity to speak were permitted to do so.

**18.** *See infra* § I (setting forth details of notice provided to the class).

**19.** Despite objections to its jurisdiction based on the filing of various interlocutory appeals of the April 30, 1993 order, the court further concluded that it has jurisdiction to determine the present motions. *Id.* at 3–4; *see infra* note 20 (listing players who asserted jurisdictional objections as a result of the appeals); *see infra* § XII (discussing that issue).

**20.** Those players are: Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Don Beebe, Greg-ory Scales, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Jerry Ball, Wilber Marshall, Paul Gruber, Byron Evans, Maurice Hurst and John Fourcade.

Counsel for a group of twenty-seven additional players appeared at the preliminary hearing on June 1, 1993, and objected to the court's jurisdiction to entertain the present motions. As the court noted in its order granting preliminary approval on June 2, 1993:

As a result of the filing of appeals of the court's order of April 30, 1993, various other players object to the court's jurisdiction, specifically Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouveia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever. (*See* Letter to court from Robert A. Brunig dated May 28, 1993.) At the hearing, counsel for those players renewed the jurisdictional objections and raised other grounds for objection.

*White v. National Football League,* Civ. No. 4–92–906, slip op. at 5 n. 5 (D.Minn. June 2, 1993). Counsel for those players, however, did not file a notice of intent to appear at the hearing on July 7, 1993, filed no further objections, and did not

fendant, the Philadelphia Eagles, has filed objections to both the original settlement and the pending motions.

Despite published notice, and notice mailed to those class members most likely to be affected by the proposed changes to the Settlement Agreement, *see infra* Section I (detailing notice), as of the date of this order, August 19, 1993, there have been no new persons filing objections to the pending motions. Moreover, on June 18, 1993, the NFLPA announced the ratification of the new Collective Bargaining Agreement, which incorporates almost verbatim the player movement rules contained in the amended version of the Settlement Agreement. The vast majority of the players who voted, more than ninety-six percent, supported the ratification of the new Collective Bargaining Agreement.[21] Supplemental Declaration of Douglas F. Allen ¶ 2 (July 1, 1993) (hereinafter "Allen Supp.Decl.").

appear at the final settlement hearing. Thus, it is unclear whether those twenty-seven players continue to object to the pending motions.

21. On June 18, 1993, the NFLPA announced that the players had ratified the new Collective Bargaining Agreement by a vote of 788 to 34. Allen Supp.Decl. ¶ 2. Since that date, the NFLPA has received nine additional votes in support of ratification. *Id.*

22. The following objectors were represented at the hearing on July 7, 1993: Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Don Beebe, Gregory Scales, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson, Jerry Ball, Wilber Marshall, Paul Gruber, Byron Evans and the Philadelphia Eagles.

Counsel for Mr. Marshall, Mr. Gruber and the Philadelphia Eagles were the only representatives who spoke at that hearing.

23. Proposed findings of fact and conclusions of law concerning the pending motions were submitted on behalf of: Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Don Beebe, Gregory Scales, the named plaintiffs, all of the defendants except the Philadelphia Eagles, the Philadelphia Eagles, Maurice Hurst, John Fourcade, Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick

On July 7, 1993, the court conducted the final settlement hearing. All persons who wished to speak were permitted to do so, and the court heard argument both in support of and against the amended Settlement Agreement and the requested findings.[22] The court also requested that any proposed findings concerning the pending motions be submitted by July 14, 1993, and considered all such submissions.[23]

As noted in its order of April 30, 1993, the court has an extensive record on which to evaluate the fairness, reasonableness and adequacy of both the original Settlement Agreement, and the motions currently pending. That record includes the voluminous submissions in the present action, and the court's personal knowledge as a result of presiding over both the present action and its predecessors for more than five years,[24] including the ten-week jury trial in *McNeil*.[25] *White*, 822 F.Supp. at 1397.

That record has provided the court with:

Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson and Jerry Ball.

24. As set forth in its order of April 30, 1993:

the court has full access to, and intimate familiarity with, the records in *Powell, McNeil, Five Smiths v. National Football League*, 788 F.Supp. 1042 (D.Minn. filed 1990), *National Football League v. National Football League Players Ass'n & Hilton*, Civ. No. 4–91–877 (D.Minn. filed Oct. 15, 1991), and *Jackson v. National Football League*, 802 F.Supp. 226 (D.Minn. filed Sept. 14, 1992). Of particular help to the court is the record in *McNeil*, which includes the *McNeil* trial transcript, comprising more than 8400 pages, and the evidence received in *McNeil*, which includes over 400 trial exhibits. The testimony and evidence received in the foregoing cases has also been supplemented by arguments of counsel and numerous legal memoranda.
*White*, 822 F.Supp. at 1397.

25. The *McNeil* jury found that the Plan B right of first refusal/compensation rules (1) had "a substantially harmful effect on competition in the relevant market for the services of professional football players"; (2) "significantly contribute[d] to competitive balance in the NFL"; and (3) were "more restrictive than reasonably necessary to achieve ... competitive balance." *See McNeil*, 1992 WL 315292, at *1 (special verdict form). The jury further found that all plaintiffs had suffered antitrust injury, although it awarded damages to only four of the eight plaintiffs in the

a comprehensive view of the workings of the NFL and the employment practices of its member clubs, the collective bargaining and labor relations history within the NFL, the nature and effects of the right of first refusal/compensation rules and other player-related rules, the terms of the proposed settlement and the nature and likely effect of the proposed NFL player rules. *Id.* at 1399.[26]

Against that background, and for the reasons stated herein, the court grants the motion to amend the Stipulation and Settlement Agreement, grants final approval of the amended version of the Stipulation and Settlement Agreement, overrules all objections to the pending motions, denies plaintiffs' motion to sanction the Philadelphia Eagles, grants the motion for further factual findings, incorporates all of the findings previously set forth in its order of April 30, 1993, and makes additional findings as set forth below.

I. PROPER NOTICE WAS GIVEN TO THE CLASS OF THE PROPOSED AMENDMENTS, THE MOTION TO GRANT FINAL APPROVAL OF THE AMENDED SETTLEMENT AGREE-MENT AND THE REQUESTED FINDINGS CONCERNING THE NFLPA AND THE NONSTATUTORY LABOR EXEMPTION

■ 1.1 The court has evaluated whether the terms of the amended Settlement Agree-ment and the requested findings are fair, reasonable and adequate using the two-stage procedure suggested in the *Manual for Complex Litigation,* § 30.44, at 241–42 (2d ed. 1985).[27] The first stage involved the court's preliminary determination of whether the amended Settlement Agreement and the requested findings fell within the range of possible approval, and whether class members should be notified of the pending motions, and the date of a final hearing on those motions. On June 2, 1993, the court determined that the amended version of the Settlement Agreement and the requested factual findings fell within the range of possible approval, and that class members should be notified of the motions and the date on which the court would conduct a final settlement hearing, July 7, 1993. *White v. National Football League,* Civ. No. 4–92–906, slip op. at 6–7 (June 2, 1993).

The second stage of the court's evaluation process involved sending notice to members of the class. The proposed amendments to the Settlement Agreement relate solely to various aspects of the new player movement system in the NFL; none of the proposed changes affects the amount of any settlement payment due to class members under the terms of the original Settlement Agreement. Thus, only those class members who continue to play for NFL clubs will likely be affected by the proposed amendments. The court therefore determined that plaintiffs should

---

total amount of $543,000, before trebling. *See id.; infra* note 39 (detailing damages awarded).

The parties reached a tentative global settle-ment before the court had entered final judgment in *McNeil.* Because defendants were unable to appeal from the *McNeil* verdict, neither the liability nor damages issues raised in *McNeil* have been finally resolved.

In its order of April 30, 1993, the court found that the *McNeil* case presented significant issues for appellate review, including the scope of the nonstatutory labor exemption, the application of the rule of reason under Section 1 of the Sherman Act, and the jury instructions regarding burden of proof and antitrust injury. *White,* 822 F.Supp. ¶ 6.2(a), at 1418.

The court further noted the existence of significant uncertainties concerning the nature and extent of damages that plaintiffs or other class members might be able to recover as a result of the operation of Plan B:

In *McNeil,* the only Plan B case tried to date, the jury made clear that such damages are difficult to prove, awarding monetary damages to only four of the eight plaintiffs despite the fact that it found all eight had suffered economic injury as a result of the Plan B rules. *Id.* at 1399; *see also Jackson v. National Football League,* 802 F.Supp. 226, 231 (D.Minn.1992) (many economic injuries alleged by professional football players "may be impossible to quantify in monetary terms", a difficulty "further confirmed by the jury's [verdict] in *McNeil* ").

**26.** On June 3, 1993, the court ordered that the records in *Powell, McNeil* and *Jackson* be incorporated into the record of the present case. *White v. National Football League,* Civ. No. 4–92–906, slip op. at 3 (D.Minn. June 3, 1993).

**27.** The court also followed that procedure for purposes of determining whether the original Stipulation and Settlement Agreement was fair, reasonable and adequate. *See White,* 822 F.Supp. ¶ 1.1, at 1399.

mail a copy of the approved notice to the following class members:

(1) all players who were on the Active List of an NFL club at the end of the 1992 NFL season;

(2) all rookies who were selected by an NFL club in the 1993 college draft; and

(3) all other players, including rookie free agents, who have signed, since March 1, 1993, a contract with an NFL club for the 1993 NFL season.

*Id.* at 6–8. The notice described the amendments to the Settlement Agreement and the requested findings, allowed class members to file objections to the pending motions prior to the final settlement hearing and provided that objectors would have an opportunity to appear and be heard at the final hearing. *Id.* Appendix A.

The court further ordered that:

A Summary Notice that is substantially similar to the one used for the original Stipulation and Settlement Agreement ... shall be published in one issue of an appropriate publication as soon as practicable after the date of entry of this order

*Id.* at 7 (citation omitted).

1.2 As previously determined in the June 2, 1993, order granting preliminary approval, the court finds that the foregoing notice of the requested findings of fact, the proposed amendments to the Settlement Agreement and the final hearing on July 7, 1993, is proper and adequate as to timing, content and means of transmission. *Id.* (such notice is "found to be due, adequate and sufficient notice, and the best notice practicable under the circumstances").

1.3 With respect to the pending motions and the final hearing on July 7, 1993, the following notice was given:

(a) On June 4, 1993, court-approved notice of the July 7, 1993, hearing and summary of the terms of the proposed changes was mailed by first-class mail, postage prepaid, to all persons whom the parties have been able to determine, through their best efforts, are class members who were on the Week 17 Roster List of an NFL Club at the end of the 1992 NFL season, and with respect to whom the parties have been able to obtain a cur-

rent or last-known mailing address. Affidavit of Arnold D. Herz of Dissemination of Notice to Class ¶¶ 2–3 (June 22, 1993) (hereinafter "Herz Aff.").

(b) On June 9, 1993, court-approved notice of the July 7, 1993, hearing and summary of the terms of the proposed changes was mailed by first-class mail, postage prepaid, to most of the persons whom the parties have been able to determine, through their best efforts, are class members who had been selected in the 1993 NFL College Draft and/or had signed, between March 1, 1993 and June 7, 1993, a player contract for the 1993 NFL Season ("the rookie class members"), and with respect to whom the parties have been able to obtain a current or last-known mailing address. On June 10 and 11, 1993, the foregoing notice was mailed to the remaining rookie class members. *Id.* ¶¶ 4–6 & n. 1.

(c) Summary Notice substantially similar to that used for the original Stipulation and Settlement Agreement was published in the Sports Section of the June 10, 1993 National Edition of *USA Today,* a daily newspaper with a circulation of approximately 1,840,000. *Id.* ¶ 8 & Exh. F.

(d) In addition to the foregoing, the NFLPA gave notice of the proposed changes to numerous class members during meetings that were conducted for purposes of obtaining player ratification of the new Collective Bargaining Agreement. On May 14, 1993, the proposed changes were also discussed during a seminar held by the NFLPA and attended by over one hundred agents who represent professional football players. *Cf. Alexander v. National Football League,* 1977–2 Trade Cas. (CCH) ¶ 61,370, at 72,989, 1977 WL 1497, at *7 (D.Minn.1977) (circumstances that increase the effectiveness of published notice to professional football players include "the fact that many class members are represented by agents or attorneys who stay conversant with player-club developments").

(e) Papers in support of the pending motions were served on all persons who had previously objected to the settlement, or

their counsel.[28] Notice of the preliminary hearing on June 1, 1993, the proposed class notice and the proposed order for preliminary approval were also served on all of those individuals or their counsel.[29]

1.4 Class members were given extensive and proper court-approved notice of the requested factual findings and the proposed amendments to the Settlement Agreement, and had an adequate and reasonable opportunity to formulate and present meaningful objections to the pending motions. Class members received extensive notice of both the terms of the original Stipulation and Settlement Agreement and the final fairness hearing on April 16, 1993. *See White,* 822 F.Supp. § I, at 1399–1402 (detailing that notice). Persons who filed objections to the original Stipulation and Settlement Agreement were notified of the pending motions and the date of the preliminary approval hearing. The original objectors had an opportunity to attend that hearing on June 1, 1993, and had nearly three weeks available to prepare and file objections between preliminary approval of the proposed changes on June 2, 1993, and the deadline for filing such objections, June 22, 1993. Class members who received mailed notice of the proposed changes had more than a week to prepare and file any objections, and almost four weeks notice of the date of the final hearing. In addition, almost four weeks were available between the publication of the Summary Notice in the June 11, 1993, edition of *USA Today,* and the final hearing date.

1.5 The court finds that the mailed and published notices clearly satisfy both Rule 23 and due process requirements. Overall, approximately 2,524 notices of the proposed changes were mailed to those class members most likely to be affected by the changes. Herz Aff. ¶¶ 2–7. Of those, a total of 99, or less than four percent, were returned by the Postal Service as undeliverable. Of the 99 returned notices, 91 were re-mailed to newly

located addresses. *Id.* ¶ 7.[30] *See Grunin v. International House of Pancakes,* 513 F.2d 114, 121 (8th Cir.) ("individualized notice by mail to the last known address [is] the 'best notice practicable' in a class action contest") (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 174–77, 94 S.Ct. 2140, 2151–2152, 40 L.Ed.2d 732 (1974)), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

1.6 The court finds that the mailed and published notices of the July 7, 1993, hearing were reasonably calculated, under all of the circumstances of NFL football, to apprise class members of the pending motions and afford them an opportunity to object. *See, e.g., Reynolds v. National Football League,* 584 F.2d 280, 285 (8th Cir.1978); *Grunin,* 513 F.2d at 121 ("the mechanics of the notice process are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process") (citations omitted). The mailed and published notices fairly, reasonably and adequately conveyed to class members the requisite information concerning the proposed changes, and afforded a reasonable time in which class members could formulate and file their objections, if any, to the pending motions. *See id.; cf.* 2 Herbert Newberg & Alda Conte, *Newberg on Class Actions* § 11.57, at 11–140 (3d ed. 1992) ("the period from receipt of notice until the actual settlement hearing is often 30 days or less").

1.7 The mailed notices also stated that class members could obtain more detailed information concerning the proposed amendments and the present litigation from the court; the published notice provided that upon objection, further information could be obtained from class counsel. *See Grunin,* 513 F.2d at 122 ("[c]lass members are not expected to rely on the notices as a complete source of settlement information") (citation omitted).

1.8 Based on the foregoing and all other evidence before the court, the court finds

---

**28.** *See supra* notes 8–10 (listing persons who had objected to the original Stipulation and Settlement Agreement).

**29.** *See supra* note 17 (listing objectors whose representatives appeared at the preliminary approval hearing on June 1, 1993).

**30.** The NFLPA tried to obtain the addresses of all persons whose notices were returned as undeliverable. Herz Aff. ¶ 7.

that pursuant to the requirements of Rule 23 and due process, proper notice of the requested factual findings and the terms of the amended Settlement Agreement has been given to class members. Accordingly, the court overrules any objections to the adequacy of the notice provided to the class.

## II. A DEFINABLE CLASS EXISTS THAT SATISFIES THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 23(b)(1)

2.1 The court incorporates the findings previously set forth in Section II of its order of April 30, 1993, and supplements those findings as follows. *See White,* 822 F.Supp. § II, at 1402–10.

2.2 After the parties reached agreement on the terms of the original Stipulation and Settlement Agreement, class counsel and the NFLPA, in the course of negotiating the terms of the new Collective Bargaining Agreement, were able to obtain further concessions from the NFL defendants which provide substantial additional benefits to the class. *See infra* ¶ 6.4 (setting forth additional benefits to class). The court finds that the proposed amendments reflecting those concessions, the NFLPA's negotiation of the new Collective Agreement and class counsel's participation in those negotiations further demonstrate that the settlement has been the product of arm's length negotiations, and that class counsel have vigorously and adequately represented the interests of all class members. *See Paxton v. Union Nat'l Bank,* 688 F.2d 552, 562–63 (8th Cir.1982) (setting forth test by which to determine adequacy of representation), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983).

2.3 The court also finds that the NFLPA's consultation in the negotiation of the original Settlement Agreement, the proposed amendments and the requested findings has substantially contributed to class counsel's ability to represent all members of the class and to negotiate a fair, reasonable

and adequate settlement. The overwhelming ratification of the new Collective Bargaining Agreement, by a vote of 788 to 34, further confirms that class counsel's representation of the class has not been compromised, and that class counsel and the named plaintiffs have adequately represented all class members. *See White,* 822 F.Supp. ¶¶ 2.12–2.21, at 1404–07 (concluding that the named plaintiffs and class counsel adequately represent the *White* class).

2.4 Relying on the foregoing findings, and those previously set forth in the order of April 30, 1993, the court reaffirms that a definable class exists that satisfies the requirements of, and should be finally certified pursuant to, Federal Rule of Civil Procedure 23(b)(1). *Cf. Reynolds,* 584 F.2d at 283 (prior to *Shutts,* finding that certification of a 23(b)(1) class is appropriate in cases involving antitrust challenges to a system of player restraints because "[a]ntitrust violations involving the rules and practices governing professional players may require the imposition of broadly based remedies").

## III. DUE PROCESS DOES NOT REQUIRE THAT ABSENT CLASS MEMBERS BE GIVEN THE RIGHT TO OPT OUT OF THE *WHITE* SETTLEMENT CLASS

3.1 In its order of April 30, 1993, the court concluded "that due process does not require that absent class members be afforded an opportunity to opt out of the *White* class settlement." *White,* 822 F.Supp. ¶ 3.6, at 1412. In making this determination, the court found that the Supreme Court's decision in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) does not preclude the certification of a mandatory class pursuant to Federal Rule of Civil Procedure 23(b)(1) in cases where claims for injunctive relief predominate over any claims for monetary damages. *White,* 822 F.Supp. ¶ 3.2, at 1410–11.[31]

31. A number of players objected to the original settlement based on the contention that under *Shutts,* and its progeny, minimum due process requires that absent class members be afforded an opportunity to opt out of all class actions that

involve claims for money damages. The court rejected that contention, and determined that:

> *Shutts* does not purport to make every mandatory non-opt-out class action unconstitutional. In *Shutts,* the Supreme Court determined that where a class action concerns claims "wholly

3.2 The court further determined that the present case is one "in which the plaintiff class's claims for structural, injunctive relief 'predominate' over its claims for damages." *Id.* ¶ 3.3, at 1411. The court relied on various factors to support this conclusion, including: (a) the repeated motions for preliminary and permanent injunctive relief filed by the plaintiffs in *Powell, McNeil, Jackson,* and *White;* (b) the need to provide a meaningful class remedy by preventing future injuries and ongoing litigation through the implementation of broad structural injunctive relief; (c) the record, and particularly plaintiffs' testimony, in *McNeil;* (d) the repeated statements of class counsel, other player representatives, and defendants and their representatives emphasizing the necessity for major restructuring of player rules affecting the terms and conditions of employment; and (e) the terms of the original Stipulation and Settlement Agreement itself, which devoted 179 pages of the 188–page document to redefining the rules and practices governing player employment in the NFL. *Id.*

The proposed amendments also focus on the restructuring of the rules and practices governing player employment. Five of the six proposed amendments modify provisions of the Settlement Agreement that concern structural changes to the NFL arising from the injunctive relief afforded to class members. *See infra* Section IV (detailing proposed amendments). As previously discussed, none of the proposed amendments affect the monetary relief provided pursuant to the terms of the original Stipulation and Settlement Agreement. *See supra* ¶ 1.1; *White,* 822 F.Supp. ¶¶ 4.9–4.10, at 1414–15 (summarizing terms of monetary settlement). The proposed amendments thus provide further support for the court's determination that class members' claims for injunctive relief predominate over the claims for monetary damages.

3.3 In the order of April 30, 1993, the court also determined that opt-out rights are not constitutionally required in cases where sufficient alternative procedural safeguards have been employed. *Id.* ¶ 3.4, at 1411–12; *see Williams v. Burlington Northern, Inc.,* 832 F.2d 100, 104 (7th Cir.1987) (although plaintiff did not have the right to opt out, court "provided [plaintiff] with the equivalent due process protection that would be accorded to a Rule (23)(b)(3) class member"), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988); *cf. Robertson v. National Basketball Ass'n,* 556 F.2d 682, 685–86 (2d Cir.1977) (discussing due process rights of mandatory class members prior to *Shutts* ). Although absent class members do not have the right to opt out, the court concluded that the requirements of due process had been satisfied for purposes of approving the original Stipulation and Settlement Agreement because class members had been:

---

or predominantly for money judgments", absent class members must be given notice, an opportunity to oppose the class settlement and an opportunity to opt out. The Supreme Court, however, did not address class actions in which the claims for injunctive relief plainly predominate, and specifically stated that its holding was:

limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominantly for money judgments. We intimate no view concerning other types of class actions....

*White,* 822 F.Supp. ¶ 3.2(a), at 1410 (quoting *Shutts,* 472 U.S. at 811 n. 3, 105 S.Ct. at 2974); *see also In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703, 713–14 (E.D.Mich.1985) (distinguishing *Shutts* for purposes of certifying class action involving claims for monetary relief under Rule 23(b)(1)); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1789, at 255 (2d ed. 1986) (noting Supreme Court's explicit limitation); 1 Herbert

Newberg & Alda Conte, *Newberg on Class Actions* § 1.19, at 1–48 (3d ed. 1992) (*Shutts* was silent concerning the validity of classes certified under Rule 23(b)(1) and "[i]t is highly unlikely that the Supreme Court would have invalidated [that] rule[] without expressly doing so").

The court also concluded that the Ninth Circuit's decision in *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386 (9th Cir.1992), does not alter the *Shutts* constitutional standard. In reaching that conclusion, the court noted that the *Brown* decision expressly recognized that "*Shutts* is limited to claims 'wholly or predominantly for money judgments.'" *White,* 822 F.Supp. ¶ 3.5, at 1412 (quoting *Brown,* 982 F.2d at 392 (quoting *Shutts,* 472 U.S. at 811 n. 3)).

This court further found that the present settlement was distinguishable from the settlement challenged in *Brown* because *Brown* involved class claims that were "wholly or predominantly" for money damages, yet the challenged settlement provided no damages recovery but only injunctive relief. *Id.*

(1) adequately represented by the named plaintiffs; (2) adequately represented by capable and experienced class counsel; (3) provided with adequate notice of the proposed settlement; (4) given an opportunity to object to the settlement; and (5) assured that the settlement will not be approved unless the court, after analyzing the facts and law of the case and considering all objections to the proposed settlement, determines it to be fair, reasonable and adequate.

*Id.* ¶ 3.4, at 1412 (citing *Williams,* 832 F.2d at 104; *Nottingham Partners v. Dana,* 564 A.2d 1089, 1100–01 (Del.1989)).

Examining those factors, the court determines that absent class members have again been adequately represented by named plaintiffs and class counsel, *see supra* § II, have been afforded adequate notice of the pending motions and have been given a meaningful opportunity to object to the motions. *See supra* § I. In addition, the court has followed the same procedure in assessing the fairness, reasonableness and adequacy of the amended Settlement Agreement and the requested factual findings. Finally, the court has agreed to retain jurisdiction over this action during the express term of the Settlement Agreement, and thus the court will be in a position to ensure that all class members' interests will be protected throughout the life of the settlement. *See White,* 822 F.Supp. at 1437. The court therefore concludes that class members' due process rights have been satisfied for purposes of evaluating the present motions, and the final approval of the amended Settlement Agreement.

3.4 Various persons object to the pending motions because the proposed amendments do not alter the Settlement Agreement to provide them with the right to opt out of the *White* class. For the reasons set forth above and in its opinion of April 30, 1993, the court reaffirms that due process does not require that absent class members be afforded an opportunity to opt out of the *White* class

settlement. *See·id.* § III, at 1410–12. Accordingly, the court overrules any objections to the certification of a mandatory class.

## IV. SUMMARY OF THE PROPOSED AMENDMENTS TO THE STIPULATION SETTLEMENT AGREEMENT [32]

### A. *Amendments Concerning Structural Relief*

4.1 *Free Agency.* Proposed Amendment No. 1 modifies the veteran free agency rules concerning Franchise and Transition Players.

(a) *Franchise Player Provisions*

Under the original version of the Stipulation and Settlement Agreement, a team was permitted to designate one Franchise Player per year by tendering an offer of a one year contract at a salary amounting to the greater of: (1) the average of the salaries from the prior season of the five highest paid players at the designated player's same position; or (2) a twenty percent increase in the designated player's previous year's salary.[33] *See White,* 822 F.Supp. ¶ 4.1(d), at 1413 (detailing Franchise Player provisions under original Settlement Agreement).

Under the proposed amendment, any 1993 Franchise Player who had not signed a player contract as of June 14, 1993, had to receive one of the following tenders on June 15, 1993: (1) an upgraded tender for the average of the five largest 1993 salaries for players at his position as of May 6, 1993; or (2) the tender previously provided under the original Settlement Agreement, but in that event the Franchise Player became free to negotiate a player contract with any club subject to a right of first refusal and draft choice compensation of two first round draft picks.

A 1993 Franchise Player will continue to have the right to receive a tender of 120 percent of his prior year's salary, with all other terms of his prior year's contract, including any guarantees and any incentive or performance bonuses, if he so wishes. If a club withdraws its required tender entirely,

---

**32.** For a summary of the terms of the original Stipulation and Settlement Agreement, *see White,* 822 F.Supp. § IV, at 1412–16.

**33.** A team thereby obtained exclusive negotiating rights to the Franchise Player, notwithstanding his years of experience.

as before, a 1993 Franchise Player will be completely free to negotiate and sign a player contract with any club without any right of first refusal for his prior club, or any signing period.

In future years of the Settlement Agreement, any player who is designated as a Franchise Player will receive one of two potential tenders under the proposed amendment: (1) an upgraded tender for the average of the five largest salaries for players at his position as of the last day of the Restricted Player signing period for that year (which is approximately May 1, 1994, for 1994 Franchise Players); or (2) a tender for the average of the five largest salaries for players at his position as of the prior year, but in that event the player will be free to negotiate a player contract with any club subject to a right of first refusal and draft choice compensation of two first round draft picks.

In future years of the Settlement Agreement, a Franchise Player will continue to have the right to receive a tender of 120 percent of his prior year's salary, with all other terms of his prior year contract, including any guarantees and any incentive or performance bonuses, if he so wishes. As before, if a club withdraws its required tender entirely, a Franchise Player will be completely free to negotiate and sign a player contract with any club without any right of first refusal for his prior club, or any signing period.

(b) *Transition Player Provisions*

Under the original version of the Settlement Agreement, in the first year of the Agreement, each team was permitted to designate two Transition Players by tendering an offer of a one year contract at a salary amounting to the greater of (1) the average of the salaries of the ten highest paid players at the designated player's same position, or (2) a twenty percent increase in the designated player's previous year's salary.[34] *See White*, 822 F.Supp. ¶ 4.1(e), at 1413 (summarizing Transition Player provisions under the original Settlement Agreement).

Under the proposed amendment, any 1993 Transition Player who had not signed a player contract as of June 14, 1993, was to receive either an upgraded tender for the average of the ten highest 1993 salaries for players at his position as of May 6, 1993, or, if he did not receive the upgraded tender, the player became free to negotiate a player contract with any club without any right of first refusal for his prior club.

A 1993 Transition Player will continue to have the right to receive a tender of 120 percent of his prior year's salary, with all other terms of his prior year's contract, including any guarantees and any incentive or performance bonuses, if he so wishes. As under the original version of the Settlement Agreement, if a club withdraws its required tender entirely, a 1993 Transition Player will be completely free to negotiate and sign a player contract with any club without any right of first refusal for his prior club, or any signing period.

4.2 *College Draft.* The proposed amendments related to expansion, as set forth in Proposed Amendment No. 2, modify Article IV of the Stipulation and Settlement Agreement, the College Draft provision, to provide that any expansion club may be allocated additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion club will participate in regular league play, up to a maximum of one additional special draft selection for each expansion club in each round of the draft in each such year.

4.3 *Entering Player Pool.* Under the proposed amendments to the Stipulation and Settlement Agreement, the entering player pool, and the rookie allocation for each expansion team, will be increased to account for the additional special draft selections that may be allocated to expansion teams. *See supra* ¶ 4.2 (noting additional draft selections provided).

4.4 *Salary Cap.* Various amendments will impact the Salary Cap provisions of the

---

34. A team thereby obtained a right of first refusal with respect to the Transition Player, notwithstanding his years of experience.

In both the second and final year of the Settlement Agreement, each team may designate one Transition Player. *See White*, 822 F.Supp. ¶ 4.1(c), at 1413.

Settlement Agreement. *See White,* 822 F.Supp. ¶¶ 4.3–4.5, at 1413–14 (summarizing Salary Cap provisions under the original Settlement Agreement). Proposed Amendment No. 4 involves a technical change in the mechanism for making adjustments to the Salary Cap in the event that player benefits unexpectedly increase as a percentage of Defined Gross Revenues at a time when the Salary Cap is in effect. Under the terms of the new Collective Bargaining Agreement, the NFLPA has a right to: (1) contest the NFL's Projected Benefits Costs, *see* Collective Bargaining Agreement, art. XLVI, § 4 (May 6, 1993); and (2) reduce player benefit payments to a level not less than seven percent of Projected Defined Gross Revenues. *Id.* § 1. This proposed amendment provides for an immediate increase in the amount of money available under the Salary Cap for players' salaries in the event that projected benefits costs are reduced pursuant to the terms of the new Collective Bargaining Agreement.

As a result of the settlement in the licensing litigation,[35] under Proposed Amendment No. 6, the calculation of Defined Gross Revenues in the Settlement Agreement may be reduced by up to $5 million per year to reflect payments that the NFLPA might receive from the NFL defendants over the next seven years. *See infra* ¶ 4.9 (setting forth details of this amendment).

Proposed Amendment No. 2 will modify the Settlement Agreement so that any bonuses that are paid to veteran players drafted by expansion clubs will not be counted under the Salary Cap. *See infra* ¶ 4.6 (detailing expansion club bonuses for veteran players).

### B. *Monetary Relief*

4.5 The proposed amendments to the Stipulation and Settlement Agreement do not change the monetary relief provided to class members under the terms of the original agreement. *See White,* 822 F.Supp. ¶¶ 4.9–4.10, at 1414–15 (summarizing terms of monetary relief provided under the original Stipulation and Settlement Agreement).

### C. *Expansion Related Amendments*

4.6 Other amendments, referred to collectively as Proposed Amendment No. 2, relate to NFL expansion. First, each expansion club may be allocated additional special draft selections in the drafts held prior to each of the first three seasons in which the expansion clubs will participate in regular league play, up to a maximum of one additional special draft selection for each expansion club in each round of the draft in each such year. *See supra* ¶ 4.2. Second, the entering player pool, and the rookie allocation for each expansion team, will be increased to account for these additional special draft selections. *See supra* ¶ 4.3. Third, the Collective Bargaining Agreement provides that each veteran player drafted by an expansion club will receive a relocation bonus of between $10,000 and $25,000. Collective Bargaining Agreement, art. XXXI, § 4. Under the proposed amendments to the Settlement Agreement, such bonuses will not be counted under the Salary Cap. *See supra* ¶ 4.4.

### D. *Proposed Amendment to Clarify Offer Sheet Terms*

4.7 Proposed Amendment No. 3 clarifies the rules concerning what type of conditional, that is variable or calculable, salary a club must match in order to retain a player subject to a right of first refusal. The amendment specifically sets forth what types. of conditional salary must be matched, thereby resolving the uncertainty created by a recent arbitration decision.[36]

---

**35.** *See White,* 822 F.Supp. ¶ 4.13, at 1415–16 (detailing licensing litigation); *infra* note 37 (listing the licensing cases).

**36.** An arbitrator recently determined that an offer sheet extended to Transition Player Will Wolford, which conditioned his salary on the salary paid to the highest paid offensive player on the offering team, with certain exceptions, was with-

in the definition of "Principal Terms" under the original Settlement Agreement. Accordingly, that offer had to be matched by Mr. Wolford's former team, the Buffalo Bills, even though matching the offer might cost the Bills more than the new team.

The arbitrator also indicated that his written opinion, which has not yet been issued, would make clear what other types of conditional salary

### E. Proposed Amendment Concerning the NFL's Right to Terminate the Settlement Agreement

4.8 Proposed Amendment No. 5 extends the NFL's right to terminate the Settlement Agreement in the event that players fail to ratify a new collective bargaining agreement in the period between the date on which the court enters the final consent judgment, and the end of the 1993 NFL season.

### F. Proposed Amendment to Change the Calculation of Defined Gross Revenues as a Result of the Settlement of the Licensing Litigation

4.9 At the time the court granted final approval to the original Settlement Agreement, various cases involving licensing rights were also in the process of being settled.[37] Since that time, the parties have reached a final settlement of those cases, under which the NFLPA is to receive at least $5 million a year over the next seven years in additional licensing revenues. As part of that agreement, the calculation of Defined Gross Revenues under the present Settlement Agreement is to be altered, pursuant to Proposed Amendment No. 6, to allow a reduction of up to $5 million a year to reflect any such payments made by defendants, thereby avoiding a situation where defendants would be forced to pay those revenues twice.

## V. STANDARD FOR COURT EVALUATION OF THE AMENDED VERSION OF THE STIPULATION AND SETTLEMENT AGREEMENT AND THE REQUESTED FINDINGS

5.1 The court has evaluated the amended version of the Stipulation and Settlement Agreement and the requested factual findings using the same standard by which it evaluated the original Stipulation and Settlement Agreement. *See White*, 822 F.Supp. § V, at 1416–17; *see also Bridgeman v. National Basketball Ass'n*, Civ. No. 87–4001, Transcript at 13 (D.N.J. Sept. 24, 1990) (analyzing whether proposed amendment to the *Bridgeman* professional basketball settlement agreement "should be approved as fair, reasonable and adequate").

5.2 As the court noted in its order of April 30, 1993:

> The policy in federal court favoring the voluntary resolution of litigation through settlement is particularly strong in the class action context.

*White*, 822 F.Supp. ¶ 5.1, at 1416 (citing *Armstrong v. Board of Sch. Directors*, 616 F.2d 305, 312–13 (7th Cir.1980); *Holden v. Burlington Northern, Inc.*, 665 F.Supp. 1398, 1405 (D.Minn.1987)).

■ 5.3 Notwithstanding that policy, Federal Rule of Civil Procedure 23(e) provides that a class action may not be dismissed or compromised without court approval. Under Rule 23(e), the district court has a duty to protect the rights of both absent class members and the named plaintiffs. *Grunin*, 513 F.2d at 123; *Welsch v. Gardebring*, 667 F.Supp. 1284, 1289 (D.Minn. 1987); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797, at 340 (2d ed. 1986) ("the purpose of [Rule 23(e)] is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights").

■ 5.4 The evaluation of a class action settlement is committed to the district court's discretion, and will not be overturned

---

might not, under certain circumstances, constitute Principal Terms of an offer sheet. That decision created uncertainty about the interpretation of the offer sheet provisions in the original Settlement Agreement.

37. In one of the cases, *NFLPA v. NFL Properties, Inc.*, No. 90–CV–4244 (S.D.N.Y.), the NFLPA sought damages for antitrust violations and tortious interference with existing NFLPA group licensing authorizations. Other licensing cases were to be settled in the context of the global settlement, including: *NFLPA v. Roby*, Case No.

92–09092(15) (Cir.Ct.Broward Cty.Fla.); *NFLPA v. Carrier*, Case No. 92 CH 3281 (Cir.Ct.Cook Cty.Ill.); *NFLPA v. Fulcher*, Case No. 92–CI–00604 (Kenton Cir.Ct.Ky.); *NFLPA v. Clayborn*, Docket No. 92–00984 (Norfolk Sup.Ct.Mass.); *NFLPA v. Golic*, Docket No. C123–92 (Sup.Ct.Bergen Cty.N.J.); *NFL Properties, Inc. v. Hi–Pro Marketing*, No. 92 Civ. 1456, 1992 WL 204370 (S.D.N.Y.); and *Aikman v. AAA Sports*, No. 92 Civ. 1457, 1992 WL 204397 (S.D.N.Y.). *See White*, 822 F.Supp. ¶ 4.13, at 1415–16 & n. 35.

except on a showing that the district court clearly abused its discretion. *See, e.g., Wiener v. Roth,* 791 F.2d 661, 662 (8th Cir.1986) (per curiam); *Reynolds,* 584 F.2d at 283; *Grunin,* 513 F.2d at 123; *cf. In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992) (although appellate court "will ordinarily defer to a district court's approval of a class action settlement unless there is a 'clear showing' that the district court abused its discretion.... [w]here ... the district court simultaneously certifies a class and approves a settlement [the appellate court] will more rigorously scrutinize the district court's analysis of the fairness, reasonableness and adequacy of both the negotiation process and the proposed settlement"), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).

Great weight is accorded the district court's views because the judge:

> 'is exposed to the litigants, and their strategies, positions and proofs. [The district court judge] is aware of the expense and possible legal bars to success. Simply stated, [the district court judge] is on the firing line and can evaluate the action accordingly.'

*Reynolds,* 584 F.2d at 283 (quoting *Grunin,* 513 F.2d at 123 (quotation omitted)).

5.5 In making such an evaluation, the district court's primary responsibility is to ensure that the settlement is "fair, reasonable, and adequate." *Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988) (citing *Grunin,* 513 F.2d at 123); *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985).

■ 5.6 When assessing the fairness, reasonableness and adequacy of the proposed settlement, the court is to examine various factors, the most important of which is the strength of plaintiffs' case on the merits balanced against the benefits to the class provided by the settlement. *Van Horn,* 840 F.2d at 607; *Grunin,* 513 F.2d at 124; *Holden,* 665 F.Supp. at 1407. Other important factors include:

> 1) the opinions of the participants, including class counsel, class representatives,

and class members; 2) the complexity, expense, and likely duration of further litigation; 3) the extent of discovery completed and the stage of the proceedings; and 4) the evidence, if any, that the proposed settlement is the product of fraud and collusion.

*Holden,* 665 F.Supp. at 1407 (citations omitted); *accord Armstrong,* 616 F.2d at 314; *Grunin,* 513 F.2d at 124; *Welsch,* 667 F.Supp. at 1290.

5.7 Moreover, in its evaluation of the class settlement;

> the court does not have the responsibility of trying the case or ruling on the merits of the matters resolved by agreement.

*Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,-370, at 72,993, 1977 WL 1497, at *12. Rather, "'the very purpose of compromise is to avoid the delay and expense of such a trial.'" *Id.* (quoting *Grunin,* 513 F.2d at 124).

## VI. THE AMENDED STIPULATION AND SETTLEMENT AGREEMENT IS FAIR, REASONABLE AND ADEQUATE

■ The court will apply the standard set forth in Section V to evaluate the pending motions.

### A. The Strengths of Plaintiffs' Case Balanced Against the Benefits of the Settlement

6.1 In weighing the strength of plaintiffs' case against the benefits provided by the amended Settlement Agreement, the court is not required:

> to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'

*Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,-730, at 72,993, 1977 WL 1497, at *12 (quoting *Young v. Katz,* 447 F.2d 431, 433 (5th Cir. 1971)). The court's analysis generally will not go beyond "an amalgam of delicate balancing, gross approximations, and rough justice." *Welsch,* 667 F.Supp. at 1290 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2d Cir.1974)).

**6.2 The Risks of Further Litigation.** The court concluded in its order of April 30, 1993 that players face numerous risks in going forward with the present litigation,[38] including:

#### (a) The Risk of an Appeal in McNeil

Despite the *McNeil* verdict, defendants' liability for the imposition of the right of first refusal/compensation rules of Plan B is still subject to appeal, and defendants have indicated their intent to appeal the *McNeil* verdict on a number of grounds, including the applicability of the nonstatutory labor exemption, defendants' alleged incapacity as a "single entity" to enter into an antitrust conspiracy, the proper application of the rule of reason under Section 1 of the Sherman Act, and the "fact of injury" element of liability in a private antitrust action.

Should the *McNeil* judgment be overturned on one or more of those grounds, players would at best be faced with the prospect of retrying, at great expense and after substantial delay, the issue of liability. At worst, if defendants were to prevail on certain issues, such as the nonstatutory labor exemption or the single entity defense, players might be entirely precluded from establishing liability.

Because the *McNeil* verdict involved only the right of first refusal/compensation rules of Plan B, players would face the additional risk of establishing defendants' liability concerning other challenged restraints, most significantly the college draft and the league's preseason pay policies, with the latter claims burdened by pending counterclaims for substantial sums.

#### (b) The Difficulty of Establishing Monetary Damages

Even if such liability were established, the *McNeil* verdict demonstrates that the class members would face substantial obstacles and uncertainties in proving damages. Evaluating the same type of damage issues presented here, the *McNeil* jury awarded no damages to four of the eight plaintiffs, and the four other plaintiffs received far less than they had sought, despite plaintiffs proffering substantial evidence in support of their damage claims.[39] *Cf. Kapp v. National Football League,* 586 F.2d 644, 648 (9th Cir.1978) (player asserting multimillion dollar claim failed to prove that challenged restraint caused any damages).

Finally, after presiding over the *McNeil* trial, the court notes that one cannot discount the reluctance of a jury to award damages to professional football players, who are readily perceived as successful, highly paid individuals. *See Alexander,* 1977–2 Trade Cas. ¶ 61,-730, at 72,995, 1977 WL 1497, at *16 (damages uncertain because there was "no assurances that class members' claims would be sympathetically viewed by the jury"); *Robertson v. National Basketball Ass'n,* 72 F.R.D. 64, 69 (S.D.N.Y.1976) (noting the difficulty of trying to convince a jury that professional basketball players, who already earned substantial salaries, should be paid more money).

---

**38.** *See White,* 822 F.Supp. ¶ 6.2, at 1417–18.

**39.** The following is a comparison of the damages that plaintiffs' expert, Michael Glassman, calcu-lated for the *McNeil* plaintiffs versus the actual damages awarded by the jury:

| Plaintiff | Actual Damages* | Estimated Damages | |
| | | Plan B Model | USFL Yardstick |
| --- | --- | --- | --- |
| Mark Collins | $178,000 | $ 396,000 | $ 387,000 |
| Don Majkowski | 0 | 1,366,000 | 1,338,000 |
| Tim McDonald | 0 | 681,000 | 668,000 |
| Freeman McNeil | 0 | 399,000 | 383,000 |
| Frank Minnifield | 50,000 | 425,000 | 410,000 |
| Niko Noga | 0 | 190,000 | 184,000 |
| Dave Richards | 240,000 | 480,000 | 473,000 |
| Lee Rouson | 75,000 | 100,000 | 97,000 |
| TOTAL | $543,000 | $4,037,000 | $3,940,000 |

*Before trebling.

*White,* 822 F.Supp. at 1418 n. 37.

In its order of April 30, 1993, the court also observed that plaintiffs' actual experience in

(c) *The Uncertain Scope of Any Injunctive Relief*

Even if it were conclusively established that all of the player rules challenged in the present class action violate the antitrust laws, it is uncertain what scope of injunctive relief would be provided to players. If the present case is not settled, players will likely face further litigation concerning the "reasonableness" of some other modified player reservation system adopted by defendants.[40]

6.3 *The Benefits to the Class.* In its order of April 30, 1993, the court determined that the terms of the original Stipulation and Settlement provided class members with substantial benefits, including:

(a) A radically modified player reservation system that affords substantial unrestricted free agency for veteran players, and ensures that almost every player with at least five years of experience (four, if a salary cap is in place) will, on contract expiration, have the opportunity to offer his services to other teams.[41]

(b) Higher tender requirements before a club can place any restrictions on a player's mobility. For example, in order to invoke the narrow exceptions for Franchise and Transition players, clubs must tender very substantial offers to players, thereby making those players among the highest paid in professional football.

(c) Lesser restrictions on players subject to the free agency limitations.

(d) A decrease in the number of rookie players subject to the college draft.[42]

(e) Substantial league-wide and team minimum guarantees that are to be paid to players in the event a salary cap goes into effect.[43]

(f) Strict anti-collusion provisions with an expedited and comprehensive enforcement mechanism to deter and punish any collusion by defendants.[44]

(g) Settlement payments to *White* class members totalling $115 million.[45]

*White*, 822 F.Supp. ¶ 6.3, at 1418–20.

The court further noted that players' marketplace experience after the implementation of the player movement rules set forth in the original Settlement Agreement confirmed the substantial benefits to the *White* class. *Id.* ¶ 6.4, at 1420.

Since the court's order of April 30, 1993, marketplace evidence further demonstrates the substantial benefits to class members. For example, the average per year salaries of players who have signed contracts since March 1, 1993, when the new player movement rules first went into effect, have more than doubled, and now exceed $1 million per year. *See* Affidavit of Jeffrey L. Kessler ¶ 3 (July 1, 1993) (hereinafter "Kessler Aff.").[46] As of June 23, 1993, 241 players had entered into new contracts with NFL teams for the 1993 season, 189 of whom were unrestricted players, and 52 were restricted free agents. The average per year salary of those players rose from $469,452 under their prior con-

*McNeil* undermines the expert opinion concerning damages proffered by various objectors. *Id.*

40. As the court observed in its April 30, 1993 order:

In *McNeil* and *Jackson*, defendants made perfectly clear their intent to impose Plan C, Plan D and so on, until one passed muster. *White*, 822 F.Supp. at 1418 n. 38.

41. *See White*, 822 F.Supp. ¶ 4.1, at 1412–13 (detailing free agency provisions under original Settlement Agreement).

42. *Id.* ¶ 4.2, at 1413 (detailing college draft provisions).

43. *Id.* ¶ 4.4, at 1414 (describing various guarantees).

44. *Id.* ¶ 4.7, at 1414 (discussing anti-collusion provisions).

45. *See id.* ¶ 4.10, at 1414–15 (setting forth details of settlement payments).

46. At the hearing on July 7, 1993, counsel for Wilber Marshall orally moved to strike Mr. Kessler's affidavit of July 1, 1993, on the ground that the affidavit addresses the adequacy of the Settlement Agreement as a whole rather than the proposed amendments thereto. Transcript of Final Fairness Hearing on the Pending Motions at 94–96 (July 7, 1993). As discussed more fully *infra*, the court is not to review the amendments in isolation but must evaluate the Agreement as a whole. *See infra* ¶ 7.10. The court therefore denies the motion to strike Mr. Kessler's affidavit.

tracts to over $1,001,257 under their new contracts, an increase of more than 110%. *Id.* Both restricted and unrestricted free agents have received enormous salary increases, with the per year average salary for unrestricted free agents increasing 102%; per year average salaries for restricted agents increased 185%. *Id.*

In addition, unprecedented player movement continues under the new free agency system. Over 100 players have switched clubs as unrestricted free agents.[47] Since March 1, 1993, twenty-one restricted free agents have received offers from other teams, and seven of them have changed employers. Kessler Aff. ¶ 6. Those figures represent a significant improvement over the experience of players restricted under Plan B: during the four years in which Plan B was in effect, only three restricted players received an offer from a competing team, and not one player actually changed teams. *Id.; White,* 822 F.Supp. at 1427 n. 61 (noting that Plan B effectively prevented any movement by players who were restricted under the Plan).

6.4 Examining the proposed amendments to the Settlement Agreement and the requested factual findings, the court finds that the changes, as a whole, provide substantial additional benefits to class members.

(a) *Proposed Amendment No. 1: The Franchise and Transition Player Rules*

The first proposed amendment will benefit class members by significantly liberalizing the Franchise and Transition Player rules. *See* Declaration of Jeffrey L. Kessler ¶¶ 6–9 (May 13, 1993) (hereinafter "Kessler Decl."). For players subject to those designations for the current year, the amendment provides that any 1993 Franchise Player who had not signed a player contract as of June 14, 1993, had to receive one of the following tenders on June 15: (1) an upgraded tender of the average of the five highest 1993 salaries for players at his position as of May 6, 1993 (instead

of the five highest salaries for the previous season, as provided for under the original version of the Franchise Player rules); or (2) the tender previously required under the original Settlement Agreement, but in that event the player became free to negotiate a player contract with any club, subject to a right of first refusal and draft choice compensation of two first round draft picks (instead of the blanket prohibition against Franchise Player movement under the original version of the rules).

Any 1993 Transition Player who had not signed a player contract as of June 14, 1993, was to receive either an upgraded tender for the average of the ten highest 1993 salaries for players at his position as of May 6, 1993 (instead of the ten highest salaries for the previous season, as provided for under the original version of the Transition Player rules), or, if he did not receive the upgraded tender, the player became free to negotiate a player contract with any club without any right of first refusal for his prior club.

In addition, 1993 Franchise and Transition Players continue to have the right to receive a tender of 120% of their prior year's salary, with all other terms of their prior year's contract, including any guarantees and incentive or performance bonuses. As before, if any of the foregoing tenders is withdrawn, the player will be completely free to negotiate with any team.

Thus, under the first proposed amendment, 1993 Franchise and Transition Players will benefit, either by receiving an upgraded tender reflecting the increased salaries that other players have obtained this year as a result of the introduction of free agency into the marketplace [48], or by having greater freedom to negotiate with other clubs.

In future years of the Settlement Agreement, players who are designated as Franchise Players will similarly benefit under the proposed amendment, either by receiving up-

---

47. Of the 189 unrestricted free agents who have entered into new contracts, 105 have signed with new teams, and 84 have resigned with their former teams. Kessler Aff. ¶ 5.

48. This change renders moot any objection that the 1993 Franchise Players will be deprived of

any increase in the marketplace for the current year, and will always be one year behind other players for purposes of participating in market-wide salary increases. *See White,* 822 F.Supp. ¶ 7.13, at 1427 & n. 60 (discussing objection more fully).

graded tenders or new opportunities to market their services to other teams subject to a right of first refusal and draft choice compensation. *See supra* ¶ 4.1(a) (detailing provision as it applies to future years).

The marketplace evidence confirms that Transition and Franchise Players have benefitted significantly under the new free agency system. Of the seventeen designated Transition Players, six signed contracts before June 15, 1993, at a per year average salary increase of over 275%. Kessler Aff. ¶ 7. As a result of the foregoing amendment, eight of the remaining 11 players received increased tenders on June 15, 1993 (based on the average of the top ten salaries at their positions as of May 6, 1993) which guarantee them, on average, a minimum salary increase of 140%. With the exception of kickers and punters, those tenders range from $1,031,917 to $3,574,500. *Id.*

The Transition Players who did not receive increased tenders as of June 15, 1993, became unrestricted free agents. Two of those players, Michael Brooks and Carl Banks, have signed contracts with new NFL teams, and their yearly averages are significantly greater than the original tenders required for Transition Players at those positions. *Id.* ¶ 8. For example, Mr. Brooks' new contract represents an average yearly salary increase of 190%. *Id.*

Recent marketplace evidence also confirms that Franchise Players will benefit by receiving significant salary increases. For example, Wilber Marshall, an objector and the Washington Redskins' designated Franchise Player, recently signed a one year contract with the Houston Oilers for the 1993 season, under which he is to receive a salary of $2.75 million, plus an agreement that the Oilers will not designate him as a Franchise Player for the 1994 season. Kessler Aff. ¶¶ 9–10 & Exh. B; *see also* Transcript of Final Fair-

ness Hearing·on the Pending Motions at 14–15 (July 7, 1993). The Washington Redskins have agreed to pay Mr. Marshall an additional $150,000. Kessler Aff. ¶ 9 & Exh. B. Mr. Marshall's ability to obtain a contract with a new team at a salary more than $1 million greater than his required tender as a Franchise Player confirms the court's prior conclusion, in its order of April 30, 1993, that the "required tenders act merely as a floor and not a ceiling on the designated player's salary." *White*, 822 F.Supp. ¶ 7.13, at 1427.[49]

Based on the foregoing, the court concludes that the proposed amendment concerning the Franchise and Transition Player rules confers significant additional benefits upon the *White* class.

(b) *Proposed Amendment No. 2: Changes Related to Future NFL Expansion*

The court also determines that the proposed amendments concerning expansion, which permit an increase in the number of draft choices for expansion teams and a modification of the Salary Cap, are highly beneficial to class members. The amendments will facilitate expansion, thereby providing more than one hundred new jobs for college and other players. The amendments also benefit class members by modifying the Salary Cap and entering player pool rules to provide more money for drafted and veteran players whose rights are acquired by expansion teams. Kessler Decl. ¶¶ 10–12.

(c) *Proposed Amendment No. 3: Offer Sheet Clarifications*

This amendment clarifies the types of conditional salary in an offer sheet that a player's prior team must match in order to retain that player subject to a right of first refusal. The amendment does not prohibit any type of conditional salary provisions. At the present time, it is unclear whether the change will affect most offer sheets. The court de-

---

**49.** An affidavit of class counsel also states that one of the objectors:

> James "Jumbo" Elliott, an offensive tackle who was designated by the New York Giants as their Franchise Player, received a minimum tender of $1,167,500, which is 91% more than his previous year's salary of $612,000.

Supplemental Affidavit of James W. Quinn ¶ 13 (Apr. 12, 1993) (hereinafter "Quinn Supp.Aff.").

The affidavit further states that another Franchise Player and objector, Steve Young, is expected:

> to negotiate a new contract paying him $4 to $5 million per year, even though the required tender at his position (quarterback) is $3,264,-000.

*Id.* ¶ 14 (citations omitted).

termines that the proposed amendment benefits the class because it resolves the uncertainty created by the Wolford arbitration. *See id.* ¶ 16; *supra* note 36. Thus, at the very least, the proposed amendment obviates the need for numerous future arbitrations, prevents additional uncertainty and delay, and possibly improves the efficiency of the offer sheet process.

(d) *Proposed Amendment No. 4: Adjustments in the Salary Cap For Changes in Projected Benefits*

This amendment provides a mechanism for making adjustments in the Salary Cap in the event that projected player benefit costs unexpectedly increase as a percent of Defined Gross Revenues at a time when the Salary Cap is in effect. To protect class members, the amendment permits an adjustment in the Salary Cap so that the "Projected Benefits" figure, on which the Salary Cap and Minimum Team Salary are based, may be immediately recalculated to reflect any change in Projected Benefits. The court finds that this amendment clearly benefits class members by preventing increases in benefit costs from holding down the Salary Cap (which takes such projected benefit cost increases into account) to levels that are detrimental to the class. *Id.* ¶ 18.

(e) *Proposed Amendment No. 5: Defendants' Right to Terminate the Settlement Agreement*

This amendment provides defendants with the right to terminate the Settlement Agreement in the event that players failed to ratify a new collective bargaining agreement. The amendment will have no impact on class members because the parties reached agreement on a new Collective Bargaining Agreement on May 6, 1993, and the players ratified the new Agreement as of June 18, 1993.

(f) *Proposed Amendment No. 6: Concerning the Calculation of Defined Gross Revenues as a Result of the Settlement of the Licensing Litigation*

This amendment permits a reduction of up to $5 million a year in the calculation of Defined Gross Revenues to reflect the amount that defendants may be required to pay to the NFLPA pursuant to the terms of the settlement of the licensing litigation. This amendment also benefits class members. First, the increased revenues will benefit NFL players by helping to fund the NFLPA's settlement administration and collective bargaining operations, with the remainder of the funds to be distributed directly to NFL players for their individual benefit. Allen Supp. Decl. ¶ 12. Second, while NFL players get the full benefit of the $5 million in increased licensing revenues that the NFLPA will receive each year for the next seven years, the Salary Cap (which is based on Defined Gross Revenues) will not be imposed either this year or in 1999, and may not be in effect for some or all of the five years in between. As a result, players will receive a guaranteed benefit of $35 million over the next seven years under Proposed Amendment No. 6, but at most, only $14,500,000 (58% of $25 million, assuming that the Salary Cap is in effect for all five years) will be deducted as an offset from the league-wide salary guarantees. Thus, this amendment produces a net benefit to players of more than $20 million dollars. Kessler Decl. ¶ 23.

6.5 The court finds that the requested findings concerning the scope and applicability of the nonstatutory labor exemption also benefit the class by providing labor and litigation peace during the term of the Settlement Agreement. *See infra* Section X (detailing requested findings).

B. *Class Counsel and Class Members Believe that the Amended Stipulation and Settlement Agreement is Fair, Reasonable and Adequate*

6.6 When seeking approval of the original Stipulation and Settlement Agreement, class counsel submitted declarations stating their belief that the settlement, as originally proposed, was in the best interests of the class. *White,* 822 F.Supp. ¶ 6.9, at 1420–21 (citing declarations of James W. Quinn and Edward M. Glennon). In its order of April 30, 1993, the court found that class counsel are experienced and competent, and that class counsel and the named plaintiffs adequately represent the *White* class. *White,* 822 F.Supp.

¶¶ 2.12–2.21, at 1404–07. The court further noted that:

> As representatives of the plaintiffs in the *Powell* and *McNeil* cases, class counsel have been intimately involved in the entire five-year history of related lawsuits which culminated in the present settlement. The court therefore affords considerable weight to the opinion of experienced and competent counsel that is based on their informed understanding of the legal and factual issues involved.

*White,* 822 F.Supp. ¶ 6.9, at 1420–21; *see Armstrong,* 616 F.2d at 325 ("[w]hile the court ... should not abdicate its responsibility to review a class action settlement merely because counsel support it, the court is entitled to rely heavily on the opinion of competent counsel"); *Welsch,* 667 F.Supp. at 1295 (the court is to give "great weight to ... the judgment of experienced counsel"). Accordingly, the court gives great weight to class counsel's opinion, as set forth in the declaration of Jeffrey L. Kessler, that the amended Settlement Agreement and the requested findings are reasonable, fair, provide substantial additional benefits to the class and are in the best interests of the class. Kessler Decl. ¶ 4.

6.7 The overall favorable response of the named plaintiffs and other class members to both the original settlement, and the pending motions, strongly supports the settlement of this action. After extensive notice by mail and publication, out of a class of more than 5,000 members, only eighty-nine college and professional players objected to the terms of the original Settlement Agreement;[50] only twenty-eight of the original objectors, and no new objectors, filed objections to the proposed amendments and requested findings.

*See supra* note 20 (listing objectors to the pending motions).

Moreover, ninety-six percent of the players who voted supported the ratification of the new Collective Bargaining Agreement, which virtually mirrors the terms of the player movement rules set forth in the amended version of the Settlement Agreement.[51] That ratification eliminates any doubt regarding the players' position, and demonstrates that the amended Settlement Agreement is overwhelmingly supported by NFL players.

### C. Complexity, Expense and Likely Duration of Further Litigation

6.8 As the court found in its order of April 30, 1993, "[c]ontinued litigation of the present action would be complex, expensive and protracted" because:

> (a) an appeal in *McNeil,* which would likely be lengthy and present complex and novel legal issues, may affect or even preclude a finding of liability;[52]
>
> (b) additional liability issues ... would have to be tried, including the legality of the college draft and the issue of preseason pay;
>
> (c) there exist complex issues concerning injunctive relief; and
>
> (d) players would be faced with the difficulty in proving damages arising from the imposition of various player rules.[53]

*See White,* 822 F.Supp. ¶ 6.2, at 1417–18.

### D. The Extent of Discovery Completed and the State of the Proceedings

6.9 The extent of discovery completed and the stage of the proceedings at which

---

**50.** *See White,* 822 F.Supp. at 1397–98 & nn. 11–12.

**51.** As previously noted, players ratified the new Collective Bargaining Agreement by a vote of 788 to 34. Allen Supp.Decl. ¶ 2.

**52.** Those issues include:

> the applicability of the nonstatutory labor exemption, defendants' alleged incapacity as a "single entity" to enter into an antitrust conspiracy, the proper application of the rule of reason under Section 1 of the Sherman Act,

and the "fact of injury" element of liability in a private antitrust action.
*White,* 822 F.Supp. ¶ 6.2(a), at 1418.

**53.** The courts that approved the settlements of the analogous *Alexander* and *Robertson* cases both noted that proof of damages in cases such as this can be extremely time-consuming and costly. *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,995, 1977 WL 1497, at *15 (trial of damages issues would be "lengthy, costly and almost overwhelming"); *Robertson,* 72 F.R.D. at 70. In addition, "[p]laintiffs' experience in *McNeil* underscores the problems in proving

settlement is reached are important factors because they are indicative of the court and counsel's ability to evaluate the merits of plaintiffs' claims. *Armstrong*, 616 F.2d at 325; *Welsch*, 667 F.Supp. at 1297. Although *White* is technically in its early stages, the court and class counsel's evaluation of the merits of plaintiffs' claims is necessarily informed by the comprehensive records compiled in the prior player lawsuits involving similar or identical issues. Just as the *Alexander* court was able to evaluate the propriety of the proposed class action in light of its experience in the *Mackey* case, here the *McNeil* case, which after years of discovery and a three-month trial has been litigated through verdict, provides a sound basis on which to evaluate the strengths and weaknesses of plaintiffs' claims and the merits of the settlement as amended. *See White*, ¶ 6.12, at 1421.

E. *The Original Settlement Agreement, the Proposed Changes and the Requested Factual Findings are the Product of Arm's Length Negotiations*

6.10 This court previously found that:

The proposed settlement is the culmination of over five years of hard fought litigation in which NFL players, represented by class counsel, challenged the legality of the NFL player reservation system.

*White*, 822 F.Supp. ¶ 6.13, at 1421 (citing *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 899 (D.C.N.Y.1975) ("[t]he four-year history of this litigation is sufficient indication that the named plaintiffs and their counsel will fairly and adequately protect the interests of the class")). The court observed that:

[D]uring the course of the litigation, the court presided over various related cases and participated in the final stages of the settlement negotiations. As a result of its involvement, the court is aware that the settlement was not reached easily, but represents the product of long and difficult negotiations, conducted in good faith and at arm's length by experienced and able attorneys.

such damages." *See White*, 822 F.Supp. ¶ 6.8, at 1420.

*Id.* (citations omitted). In making that determination, the court relied on the following factors:

the size and complexity of the [Settlement] Agreement and the compromises reflected therein; the context in which it was reached, that is, after five and one-half years of frequently acrimonious litigation; the court's personal knowledge of the negotiators and the tenacity with which they struggled to protect their principals' interests; and the need for the court's involvement in the final stages of the negotiations.

*Id.* The court finally relied on its determination that the terms of the original Stipulation and Settlement Agreement are fair, reasonable and adequate to the class because in such circumstances, the court may presume that the negotiations were proper. *Id.* (citing *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D.Ohio 1992) (citation omitted)); *see also White*, Transcript of Preliminary Approval Hearing for the Original Settlement Agreement at 82–84 (Feb. 26, 1993) (finding no evidence of collusion and concluding settlement was product of arm's length negotiations).

After the parties reached agreement on the terms of the original Stipulation and Settlement Agreement, class counsel and the NFLPA, in the course of negotiating the terms of the new Collective Bargaining Agreement, were able to obtain further concessions from the NFL which afford substantial additional benefits to the class. *See supra* ¶ 6.4 (setting forth those benefits). The court finds that the proposed amendments, which reflect those concessions, further demonstrate that the settlement is the product of arm's length negotiations.

VII. THE CLAIMS OF THE OBJECTORS DO NOT WARRANT DISAPPROVAL OF THE AMENDED SETTLEMENT AGREEMENT

7.1 Objections to the pending motions were filed on behalf of twenty-eight players who had previously objected to the original Stipulation and Settlement Agreement.[54] In

54. *See supra* note 20 (listing those objectors, and also the twenty-seven players who objected at the

addition, one NFL member club, the Philadelphia Eagles, has objected to the motions. Section VII of this opinion will address the substantive objections to the motions to amend the Settlement Agreement, and to approve the amended Settlement Agreement.[55] Objections to the motion for further factual findings will be discussed in Section X of the opinion.

A. *Player Objections to the Motions to Amend and Approve the Settlement Agreement*

7.2 When evaluating the objections to the original Settlement Agreement in the order of April 30, 1993, the court first observed that claims of inadequacy by some class members are entitled to little weight in situations where the "vast preponderance of the class members" do not oppose the terms of a settlement. *White,* 822 F.Supp. ¶ 7.2, at 1425 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir.1974)); *cf. Van Horn,* 840 F.2d at 606 ("class settlement may be approved over significant percentage of objections from class members"). In any given year, the NFL employs approximately 1,500 players during the course of the regular season, and employs hundreds of additional players during the preseason. Class counsel estimates that the *White* class consists of more than 5,000 active and former NFL players, as well as numerous players who are likely to be drafted. Less than two percent of the total class objected to the terms of the original settlement. *White,* 822 F.Supp. ¶ 7.2, at 1425. Less than one percent of the total class object to the amended version of the Settlement Agreement. *See supra* note 20. In addition, the new Collective Bargaining Agreement was ratified by over ninety-six percent of the players who voted. Based on the foregoing, the court concludes that the vast preponderance of the class supports the proposed settlement.

preliminary hearing, but failed to subsequently object or appear at the final settlement hearing on July 7, 1993).

55. Objections to the adequacy of notice and the certification of a mandatory class are discussed *supra. See* §§ I–III. Objections to the court's jurisdiction are discussed *infra. See* §§ XI–XII.

7.3 As a preliminary matter, the court notes that most of the objections to the amended Stipulation and Settlement Agreement and the requested findings of fact simply renew objections that have already been considered and rejected by the court. Other than the Philadelphia Eagles, the overwhelming majority of class members who oppose the original or the amended version of the Settlement Agreement on the merits do so because: (i) one or more elements of the proposed player reservation system allegedly violate the antitrust laws, or (ii) one or more provisions of the settlement are allegedly unfair as applied to that player or group of players. The court incorporates the findings set forth in its order of April 30, 1993, concerning players' objections to the original Settlement Agreement, and makes the following additional findings.[56]

7.4 A number of objectors contend that the court must withhold its approval because various provisions of either the original Settlement Agreement, or the amended version of the Agreement, violate the antitrust laws.

7.5 The order of April 30, 1993, set forth the standard by which the court is to review the amended Settlement Agreement:

In reviewing a proposed class action settlement, the Eighth Circuit has determined that the trial court does not have the privilege or duty of independently resolving the issues of fact and law 'which underlie the merits of the dispute.'

*White,* 822 F.Supp. ¶ 7.5, at 1425 (quoting *Grunin,* 513 F.2d at 123 (quotation omitted)). "'The very purpose of compromise is to avoid the delay and expense of such a trial.'" *Id.* (quoting *Grunin,* 513 F.2d at 124 (quotation omitted)).

7.6 When evaluating the propriety of an antitrust class action settlement, the *Grunin* court further held that:

56. The court did not address most of the objections individually because many of the player-objectors have moved to join with others' objections, either in their briefs or at one or more of the hearings.

unless the terms of the agreement are *per se* violations of antitrust law, we must apply a 'reasonableness under the totality of the circumstances' standard to the court's approval.

*Grunin,* 513 F.2d at 124.

7.7 The Second Circuit applied the *Grunin* standard when affirming the district court's approval of the *Robertson* class action settlement, which involved the antitrust claims of professional basketball players. The Second Circuit held that such a settlement agreement should be approved unless the terms of the agreement are *per se* illegal, are illegal to a "legal certainty" or authorize future conduct that is clearly illegal. *Robertson,* 556 F.2d at 686 (quoting *Grunin,* 513 F.2d at 124).

7.8 In *McNeil,* this court determined that right of first refusal/compensation rules of Plan B should be evaluated under the rule of reason, rather than the *per se* rule. *McNeil v. National Football League,* 790 F.Supp. 871, 896–97 (D.Minn.1992).[57] In making that determination, the court observed that all of the cases to date had "applied the rule of reason rather than the *per se* analysis" to evaluate whether various NFL player restrictions violated the antitrust laws. *Id.*[58] Therefore, in the absence of a full trial on the merits, it is unlikely that the proposed settlement, taken as a whole, would be deemed a *per se* violation of the antitrust laws because the amended Settlement Agreement would likely be subject to analysis under the rule of reason. *See Robertson,* 556 F.2d at 686 (court should not disapprove of settlement if "challenged practices have not been held to be per se illegal in any previously decided case"); *Grunin,* 513 F.2d at 124. Moreover, the *Alexander* court expressly approved, and the Eighth Circuit upheld, a player reservation system that was more restrictive than that set forth in the present settlement.[59]

> The order of April 30, 1993, noted that:
>
> It is also significant that all aspects of the new free agency system contained in the Settlement Agreement ... will likely be included in a new collective bargaining agreement, under which such provisions

**57.** The *McNeil* plaintiffs argued that there was "sufficient judicial experience" concerning the illegality of various player restraints "to warrant the application of the *per se* rule" to the challenged Plan B rules. 790 F.Supp. at 896. The court rejected that contention, concluding that it was "bound by the *Mackey* decision, in which the Eighth Circuit determined that the Rozelle Rule should be judged under the rule of reason", rather than the *per se* rule. *Id.* at 897.

> The order of April 30, 1993 noted that:
> if there is future litigation concerning the legality of any NFL player rules, plaintiffs' argument may be adopted by some court. This court, however, makes no ruling on the issue.

*White,* 822 F.Supp. at 1426 n. 55.

**58.** *See, e.g., Mackey v. National Football League,* 543 F.2d 606, 619 (8th Cir.1976) ("the unique nature of the business of professional football renders it inappropriate to mechanically apply *per se* illegality rules"); *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1182 (D.C.Cir.1978) ("the legality of player restrictions in professional sports should be governed by the rule of reason"); *Kapp v. National Football League,* 390 F.Supp. 73, 82 (N.D.Cal.1974) ("in this particular field of sports league activities the purposes of the antitrust laws can be just as well served (if not better served) by the basic antitrust reasonableness test as by the absolute *per se* test sometimes applied by the courts in other fields"), *aff'd in part and dismissed in part on other grounds,* 586 F.2d 644 (9th Cir.1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

**59.** Some objectors argue that the Franchise Player provisions violate the antitrust laws based on their contention that the Franchise Player rules are as restrictive as the right of first refusal/compensation rules of Plan B. The *McNeil* jury found that the Plan B rules, which permitted the restriction of thirty-seven players per team, were more restrictive than reasonably necessary. *McNeil,* 1992 WL 315292, at *1 (special verdict form). The Franchise Player provisions, however, are narrower in scope because they permit restriction of, at most, only one player per team per year. *White,* 822 F.Supp. ¶ 7.13, at 1426–27 & n. 59. Moreover, only ten teams actually designated Franchise Players for the 1993 season, likely as a result of the substantial tenders that were required for such designation under the terms of the original Settlement Agreement. *Id.* at 1427 n. 57. The court therefore rejects the contention that the Franchise Player rules must be altered because they are as restrictive as the Plan B rules.

The court further concludes that the objectors' reliance on the *McNeil* verdict may be misplaced. As previously discussed, the *McNeil* verdict has never been appealed, and the case raises numerous novel and difficult legal issues that, if resolved in defendants' favor, could preclude play-

would be exempt from antitrust law as a result of the nonstatutory labor exemption. *White*, 822 F.Supp. ¶ 7.16, at 1428. As previously discussed, the free agency system set forth in the amended Settlement Agreement has been incorporated almost verbatim in the new Collective Bargaining Agreement, and any such rules would therefore be exempt from antitrust challenge during the express term of the new Collective Bargaining Agreement. *See infra* § X (reaffirming that conclusion). Accordingly, the court overrules any objections concerning the legality of the amended Settlement Agreement under the antitrust laws, and concludes that the amended Settlement Agreement, as a whole, is not *per se* illegal. *Cf. White*, 822 F.Supp. ¶ 7.29(d), at 1432 (original Settlement Agreement is not *per se* illegal).[60]

7.9 As with the original Settlement Agreement, various objectors ask the court to disapprove of the entire amended Settlement Agreement because of one or two provisions. Alternatively, they ask the court to strike or revise those provisions before approving the terms of the amended settlement.

7.10 In *Evans v. Jeff D.*, the Supreme Court determined that when a district court evaluates the settlement of a class action:

> Rule 23(e) does not give the court the power, in advance of trial, to modify a proposed consent decree.... The options available to the District Court [a]re essentially the same as those available to respondents: it could have accepted the proposed settlement; it could have rejected the proposal and postponed the trial to see if a different settlement could be achieved; or it could have decided to try the case.

*Evans v. Jeff D.*, 475 U.S. 717, 726–27, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986).

This court has held that:

> in acting to protect the interests of the class when reviewing a settlement, the court cannot rewrite or modify the terms of the agreement.... The settlement must be approved or disapproved as a whole.

*Welsch*, 667 F.Supp. at 1289–90 (citations omitted). Another judge in this district has similarly ruled that:

> [a]lthough the court must act to protect the interests of the class when reviewing the proposed settlement, the court also recognizes that it is limited in its ability to change that agreement. The proposed settlement must stand or fall as a whole.... The court is not to dictate or rewrite the terms of the proposed agreement.

*Holden,* 665 F.Supp. at 1406 (citations omitted).

Applying that standard, this court previously determined that:

> even if it were sympathetic to objections directed at one or more provisions of the Settlement Agreement, the court may not

*White*, 822 F.Supp. ¶ 7.12, at 1426 (footnote omitted).

Class counsel and the named plaintiffs believe that none of the player movement or employment rules set forth in the amended Settlement Agreement bear any relation to competitive balance, the quality of play or franchise stability. The court, however, need not resolve this dispute, but rather notes that the existence of the dispute, as well as the parties' agreement to various settlement provisions, such as the Franchise and Transition Player rules, the College Draft, the Entering Player Pool, the veteran free agency rules, the Final Eight Plan, and the Guaranteed League–Wide Salary, Salary Cap, and Minimum Team Salary rules, merely demonstrate that the settlement was negotiated at arm's length and in good faith. The court will therefore not second-guess the parties' hard-bargained agreement

---

**60.** The court noted in its order of April 30, 1993, that:

> the revised player employment rules set forth in the Settlement Agreement constitute a new and unique approach to player employment in the NFL. Class counsel and the NFLPA believe that the entire Agreement will benefit the overwhelming majority of the players in the NFL, and raise salaries throughout the league. Defendants believe that the provisions challenged by various objectors, including the college draft, the rules concerning modified free agency, the Franchise and Transition Player provisions, the Final Eight Plan and the salary cap, are essential for the maintenance of competitive balance, quality of play and franchise stability.

pick and choose which provisions to approve and which to disapprove.

*White,* 822 F.Supp. ¶ 7.10, at 1426.

7.11 At least one objector, Paul Gruber, contends that by seeking approval of the proposed amendments to the original version of the Stipulation and Settlement Agreement, the parties are improperly asking the court to pick and choose which provisions to approve or disapprove. He argues that if the parties have the right to make such a request, the objectors must also have that right.

The parties, however, do not ask the court to pick and choose among various provisions, but instead seek court approval of the entire amended Stipulation and Settlement Agreement. The parties are thus asking the court to approve *their own agreement* to amend the original Settlement Agreement, a situation which is distinguishable from that presented when an objector asks the court, on its own initiative, to modify or rewrite the terms of the parties' agreement. It is entirely appropriate that the parties seek court approval of an amendment to their own settlement agreement. *See, e.g., Liddell v. Board of Educ.,* 867 F.2d 1153, 1155 (8th Cir.1989) (district court had authority to approve proposed amendment to settlement agreement that modified the terms of the original settlement to provide the parties with additional time to meet certain obligations); *Harris v. Reeves,* 761 F.Supp. 382, 394–402 (E.D.Pa.1991) (approving stipulation and agreement that revised and superseded an earlier settlement agreement which had been entered as a consent order); *cf. Bridgeman v. National Basketball Ass'n,* Civ. No. 87–4001, Transcript at 13 (D.N.J. Sept. 24, 1990) (analyzing whether proposed amendment to the *Bridgeman* NBA settlement agreement "should be approved as fair, reasonable and adequate"). As previously discussed, however, it is improper for the court, on its own initiative or at the request of an objector, to rewrite or modify the parties' agreement before approving it. *See Evans v. Jeff D.,* 475 U.S. at 726–27, 106 S.Ct. at 1537; *Welsch,* 667 F.Supp. at 1289–90 ("the court cannot rewrite or modify the terms of the agreement"); *Holden,* 665 F.Supp. at 1406

("[t]he court is not to dictate or rewrite the terms of the proposed settlement"); *supra* ¶ 7.10. The court therefore rejects Mr. Gruber's contention.

7.12 If the court concludes that the amended Settlement Agreement, as a whole, is fair, reasonable and adequate to the class, its inquiry is ended and it should approve the entire settlement.

7.13 When evaluating the original Settlement Agreement, the court determined that:

> after carefully considering all of the objections that call into question a specific provision or provisions of the Settlement Agreement, the court nonetheless concludes that the Agreement, as a whole, is fair, reasonable and adequate to the class. Accordingly, the court will not deny final approval on the basis of those objections.

*White,* 822 F.Supp. ¶ 7.11, at 1426.

7.14 After analyzing the objections to various provisions of the amended Settlement Agreement, the court finds that the amended Agreement, taken as a whole, is also fair, reasonable and adequate to the class. Therefore, the court will not withhold final approval of the amended Settlement Agreement on the basis of the objections to various individual provisions.

7.15 Although the court must analyze the amended Settlement Agreement as a whole, the following specific objections to the amended Settlement Agreement have been made.

■ 7.16 Various players continue to object to the Franchise Player provisions, arguing that the amended rules are no more reasonable than those set forth in the original Settlement Agreement. In approving the original Settlement Agreement, the court made the following findings concerning the Franchise Player provisions contained therein:

> (i) a club invoking the Franchise Player provisions must make an extraordinarily high salary tender to any player so designated; (ii) such required tenders act merely as a floor and not a ceiling on the designated player's salary; and (iii) the

Franchise Player provisions are extremely limited in scope.

Id. ¶ 7.13, at 1426–27 (footnotes omitted). The court further found that the minimum tender for Franchise Players "protects class members to the extent that it deters teams from making such designations." *Id.* at 1427 n. 57. The court concluded that "objections to the Franchise Player provisions provide no basis on which to reject the proposed settlement." *Id.* ¶ 7.13, at 1427.

The court also concludes that the objections to the amended Franchise Player rules provide no basis for disapproving the entire amended Settlement Agreement. As previously discussed, the amended rules provide 1993 Franchise Players with additional benefits, either by increasing the minimum tenders required for such designations [61] or by affording players greater freedom to negotiate with other clubs.[62] *See supra* ¶ 6.4(a) (detailing additional benefits).

Players who are designated as Franchise Players in future years will similarly benefit under the amended rules, either by receiving upgraded tenders or new opportunities to market their services to other teams subject to a right of first refusal and draft choice compensation. *See supra* ¶ 4.1(a) (detailing provision as it applies to future years).[63]

Based on the foregoing, the court concludes that the amendment to the Franchise Player rules serves only to provide additional benefits to the players so designated, and thus provides no basis for disapproving the entire amended Settlement Agreement.

■ 7.17 Other class members object to the expansion related amendments to the college draft and entering player pool provisions, arguing that the change will result in the restriction of a greater number of college, and possibly veteran, players.[64] Those amendments, however, will facilitate expansion in the NFL, thereby providing a substantial number of additional jobs for both college and other players.[65] The amendments afford further benefit to players by creating an exception to the Salary Cap for bonuses that the NFL has agreed to provide for veteran players under contract who are drafted by expansion clubs. The court further notes that none of the objections to the expansion related amendments have been asserted by, or on behalf of, college or other future NFL players, the group most likely to be affected by the changes.[66] Based on the foregoing, the court overrules any objections to the expansion related amendments based on the contention that those amendments impermissibly restrict a greater number of players.

where the amended Settlement Agreement itself is not, as a whole, illegal *per se.*

**61.** Under the amended rules, the minimum tender is based on the average of the top five salaries at that player's position for this year, rather than 1992, thereby permitting 1993 Franchise Players to participate in the increased salaries that other players have obtained as a result of the introduction of free agency into the marketplace.

Moreover, as previously noted, that change renders moot any objection that the 1993 Franchise Players will be deprived of any increase in the marketplace for the current year, and will always be one year behind other players for purposes of participating in market-wide salary increases. *See White,* 822 F.Supp. ¶ 7.13, at 1426–27 & n. 60.

**62.** If a Franchise Player receives a tender for the average of the five highest salaries for players at his position as of the prior year, that player is free to negotiate a player contract with any club, subject to a right of first refusal and draft choice compensation of two first round draft picks. This amendment eliminates the blanket prohibition against movement set forth in the prior version of the Franchise Player provisions.

**63.** As previously discussed, recent marketplace evidence also confirms that Franchise Players will likely benefit by receiving significant salary increases. *See supra* ¶ 6.4(a).

**64.** The court previously overruled all objections to the entering player pool and college draft provisions as set forth in the original Stipulation and Settlement Agreement. *See White,* 822 F.Supp. ¶ 7.17, at 1428.

**65.** Defendants also contend that the amendments will afford new teams greater access to the available talent, thereby increasing the likelihood that such teams will become more competitive in their early years of play. Plaintiffs dispute that contention, and the court makes no finding concerning defendants' assertion.

**66.** Although sixteen college players objected to the original Stipulation and Settlement Agreement, *see White,* 822 F.Supp. at 1398 & n. 12, none of those players, or any other college players, filed objections to the pending motions to amend the Settlement Agreement and for further factual findings.

■ 7.18 Other objectors contend that Proposed Amendment No. 3, which clarifies the rules regarding what type of conditional salary must be matched in order to retain a player subject to a right of first refusal, will reduce player movement, thereby harming the class and violating the antitrust laws. There is no evidence to support the contention that the clarifications will impede player movement, and the court finds that it is unclear what effect, if any, the proposed amendment will have on any such movement. Moreover, as previously discussed, it is not for the court to determine, in the absence of a *per se* violation of the antitrust laws, the antitrust reasonableness of a specific provision of the Settlement Agreement. *See supra* ¶¶ 7.6–7.8. Finally, the court concludes that the amendment will benefit class members to the extent that such clarifications may increase the efficiency of the offer sheet process and eliminate the need for numerous future arbitrations, as well as additional uncertainty and delay. Accordingly, the court overrules the objections to the offer sheet clarifications set forth in Proposed Amendment No. 3.

■ 7.19 The court stated in the order of April 30, 1993, that it had:

considered objections to the salary cap provisions, and concludes that such objections do not warrant disapproval of the settlement. [T]he salary cap must not be viewed in isolation, but rather, in connection with the entire agreement accepted by class counsel, including the liberalized free agency provisions and the minimum revenue guarantees that would accompany the "triggering" of the salary cap provisions.

*White,* 822 F.Supp. ¶ 7.16, at 1428; *see id.* ¶¶ 4.3–4.5, at 1413–14 (summarizing Salary Cap provisions). Various objectors contend that Proposed Amendment No. 4, which provides a mechanism for Salary Cap adjustments in the event that player benefit costs increase, affords improper payments or other consideration to the NFLPA.

The new Collective Bargaining Agreement provides the NFLPA with greater discretion in regulating the allocation of total revenues going to players in the form of benefits and salaries.[67] Proposed Amendment No. 4 provides that the "Projected Benefits" figure under the Settlement Agreement, on which the Salary Cap and Minimum Team Salary are based, may be immediately recalculated to reflect any change in Projected Benefits, thereby increasing the money available under the Salary Cap for players' salaries. The court finds that the proposed amendment will protect players in the event that projected player benefit costs, which are substantially increased as a result of the much larger benefits provided under the Collective Bargaining Agreement, unexpectedly increase as a percentage of Defined Gross Revenues at a time when the Salary Cap is in effect. Without such a mechanism, unexpected future increases in benefit costs (as a percentage of Defined Gross Revenues) could hold down the Salary Cap to levels that are detrimental to class members. The amendment does not provide the NFLPA with any payments or other consideration, but merely affords a necessary and appropriate mechanism to effectuate the NFLPA's increased discretion under the new Collective Bargaining Agreement. The court therefore finds that the change clearly benefits all class members, and overrules the objections to Proposed Amendment No. 4.

7.20 Various players object to Proposed Amendment No. 5, which allows the NFL to terminate the Stipulation and Settlement Agreement in the event that the players fail to ratify a new collective bargaining agreement. As previously set forth, on June 18, 1993, the NFLPA announced the ratification of the new Collective Bargaining Agreement. The amendment will have no impact on class members, therefore the court overrules as moot all objections to Proposed Amendment No. 5.

7.21 The court has also considered the objections to Proposed Amendment No. 6,

---

**67.** Under the new Collective Bargaining Agreement, the NFLPA has the right to: (1) contest the NFL's Projected Benefits Costs, *see* Collective Bargaining Agreement, art. XLVI, § 4; and (2) reduce player benefit payments to a level not less than seven percent of Projected Defined Gross Revenues. *Id.* § 1.

which provides a partial credit to defendants in the calculation of Defined Gross Revenues to prevent double counting of certain additional revenues that may be provided to the NFLPA under the terms of the licensing litigation settlement.[68] As discussed more fully *infra*, the court rejects any claim that the settlement of the licensing litigation, in combination with Proposed Amendment No. 6, violates federal labor law. *See* ¶¶ 7.27–7.31. The court further concludes that the benefits to NFL players as a result of the licensing litigation settlement outweigh any potential reduction in the Salary Cap, and provide class members with a net benefit of more than $20 million dollars. *See supra* ¶ 6.4(f) (setting forth basis of this conclusion); Allen Supp.Decl. ¶¶ 11–15; Kessler Decl. ¶¶ 22–23. The court therefore overrules any player objection to Proposed Amendment No. 6.

B. *The Philadelphia Eagles' Objections to the Motions to Amend and Approve the Settlement Agreement and to the Wording of the Proposed Consent Judgment*

7.22 One of the defendants, the Philadelphia Eagles, opposes final approval of the amended Settlement Agreement and the motion for further factual findings, renewing its objections to the original Stipulation and Settlement Agreement.[69] The Eagles also object to the wording of the proposed Final Consent Judgement. (*See* Letter from Peter S. Hendrixson to court dated July 19, 1993). The court incorporates the findings set forth in its order of April 30, 1993, concerning the Eagles' objections, and makes the following

additional findings. *See White,* 822 F.Supp. ¶¶ 7.19–7.27, at 1429–31.

7.23 In its order of April 30, 1993, the court found that the Eagles lacked standing to assert such objections for the following reasons: (1) the Settlement Agreement is not *per se* illegal, and thus the Eagles are unable to demonstrate any legal prejudice [70]; (2) the Eagles delegated complete authority to the NFL Management Council to settle the case and, pursuant to the Articles of Association and Bylaws of the Council, are bound by the Council's actions, including its unanimous approval of the present settlement; (3) the Eagles have breached their obligation under the Settlement Agreement "not [to] take any action to delay or hinder" court approval of the Settlement Agreement; and (4) the Eagles have violated the court's order of February 26, 1993, which required all defendants to abide by the terms of the Settlement Agreement (including the provisions discussed immediately above) pending the court's final ruling on the Settlement Agreement.[71] *White,* 822 F.Supp. ¶ 7.20, at 1429–30.

At the final fairness hearing on July 7, 1993, counsel for the Eagles was afforded an opportunity to reargue the issue of standing, but failed to do so. *White v. National Football League,* Transcript of Final Fairness Hearing on the Pending Motions, at 71–84, 105 & 124–25 (July 7, 1993). The court therefore affirms, for the reasons previously set forth, that the Eagles lack standing to object to the amended Settlement Agreement, the requested findings of fact and the proposed Final Consent Judgment.

 7.24 Despite that conclusion, the court will address the merits of Eagles' objections concerning the pending motions to

68. This section will focus on players' objections to Proposed Amendment No. 6. Objections asserted by the Philadelphia Eagles will be discussed below. *See infra* ¶¶ 7.22–7.33.

69. The Eagles argued that the court should deny approval of the original Settlement Agreement because:

(i) the proposed settlement of related litigation concerning players' licensing rights is unlawful; (ii) the NFLPA's role in settlement negotiations was in violation of the National Labor Relations Act; and (iii) the Settlement Agree-

ment improperly requires the court to issue an advisory opinion concerning the scope of the nonstatutory labor exemption. *White,* 822 F.Supp. ¶ 7.19, at 1429.

70. *See, e.g., Alumax Mill Prods., Inc. v. Congress Fin. Corp.,* 912 F.2d 996, 1001–02 (8th Cir.1990) (a nonsettling defendant has standing to object to a settlement only if it can demonstrate some form of legal prejudice).

71. *White,* No. 4–92–906, slip op. at 5 (D.Minn. Feb. 26, 1993) (ordering defendants to abide by terms of Settlement Agreement).

ensure a complete record.[72] The principal thrust of the Eagles' renewed objections involves a challenge to the legality, under the federal antitrust and labor laws, of the related settlement between the NFL and the NFLPA of various lawsuits, and other disputes and claims, arising out of their respective licensing activities. The licensing settlement had not been consummated as of April 16, 1993, the date of the final fairness hearing on the original Settlement Agreement. In the order of April 30, 1993, the court found that it was under no obligation, pursuant to Federal Rule of Civil Procedure 23, to evaluate the terms of the proposed licensing settlement, to which the original Stipulation and Settlement Agreement merely referred. The court reasoned that such an evaluation was irrelevant to the court's inquiry concerning whether the proposed Settlement Agreement was fair, reasonable and adequate to the class, and declined to address the merits of the Eagles' objections concerning the legality of the proposed licensing settlement. *White*, 822 F.Supp. ¶ 7.22, at 1430.

The Eagles contend that the court must now address the arguments concerning the legality of the licensing settlement as a result of Proposed Amendment No. 6 to the *White* Settlement Agreement, which provides for an adjustment in Defined Gross Revenues to reflect any payments that the NFL may make to the NFLPA pursuant to the terms of the licensing settlement.

The parties agreed to the changes set forth in Proposed Amendment No. 6 in order to fully and fairly implement the settlement of the related licensing litigation, thereby effectuating a primary goal of the present Settlement Agreement, labor and litigation peace. Unlike the situation that existed when the parties sought approval of the original Stipulation and Settlement Agreement, which merely referred to a possible settlement of the licensing litigation, the contemplated changes to the Settlement Agreement set forth in Proposed Amendment No. 6 have created a direct relationship between the settlement of the present action and the fully executed settlement of the licensing cases. Accordingly, the court now deems it necessary and appropriate to review various terms of the licensing settlement, at least to the extent that those terms bear a relationship to the motions pending before the court.[73]

7.25 The Eagles first object to the terms of the licensing litigation settlement and the corresponding amendment to the *White* Settlement Agreement, Proposed Amendment No. 6, because they allegedly harm NFL players. As a preliminary matter, the court notes the incongruity of the Eagles' contention that the changes to the calculation of Defined Gross Revenues are detrimental to players' interests.[74] The terms of the amended Settlement Agreement, including that amendment, have been incorporated into a new Collective Bargaining Agreement that has been overwhelmingly ratified by NFL players, providing strong evidence of the fairness and adequacy of the *White* settlement. Proposed Amendment No. 6 must also be evaluated in light of the licensing settlement, the net effect of which is to provide more than $20 million dollars in additional benefits to NFL players. *See supra* ¶¶ 6.4(f), 7.21.

7.26 The court also rejects the Eagles' contention that the licensing payments will impermissibly enrich the NFLPA at the players' expense. The court finds that the NFLPA's interest in settling the licensing litigation does not conflict with the players'

---

72. The court similarly reached the merits of the Eagles' objections to the original Stipulation and Settlement Agreement. *See White*, 822 F.Supp. at 1429 n. 67, ¶¶ 7.21–7.27, at 1430–31.

73. The court thus alters its prior determination that all matters related to the settlement of the licensing litigation are "outside of the purview of this court". *See* Transcript of Hearing for Final Approval of the Original Settlement Agreement at 143 (D.Minn. Apr. 16, 1993). The court notes, however, that in addressing various matters concerning the licensing settlement, the court is not thereby "deciding whether [those cases] should be settled or not, or the terms of how that should be." *Id.*

74. It seems highly unlikely that the Eagles' motivation stems from any genuine concern for players' interests. *See White*, 822 F.Supp. ¶ 7.21, at 1430 (questioning the plausibility of the Eagles' objections in light of the evidence that the team is merely seeking additional draft selections as compensation for the loss of various players' services).

interests.[75] The court further finds that the payments to the NFLPA pursuant to the licensing litigation settlement will benefit players, either by direct payment of such funds to the players, or by helping to fund the NFLPA's collective bargaining activities and its obligation to administer and ensure compliance with the Settlement Agreement. *See* Allen Supp. Decl. ¶ 12. The court therefore rejects the Eagles' claim that the payments to the NFLPA under the terms of the licensing litigation settlement are contrary to the players' interests.

Based on the foregoing, the court overrules the Eagles' objections to the extent that they rest on any alleged harm to class members' interests.

 7.27 The court also finds no merit to the Eagles' contention that any payments provided by the NFL to the NFLPA in the licensing litigation settlement, and the corresponding amendment to calculation of Defined Gross Revenues under the *White* Settlement Agreement, violate section 302 of the Labor Management Relations Act, 29 U.S.C. § 186. Section 302(a) and (b) of that Act generally prohibit the payment of money, or any "other thing of value" by an employer to an employee representative. 29 U.S.C. § 186(a)–(b).

> The general prohibition of section 302 is: aimed at forestalling practices Congress considered injurious to the collective bargaining process such as bribery of employee representatives by employers, extortion by employee representatives, and the potential abuse of power by union officials armed with sole control of welfare funds.

*N.L.R.B. v. United Bhd. of Carpenters & Joiners*, 531 F.2d 424, 427 (9th Cir.1976) (citing *Arroyo v. United States*, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959)); *see also United Steelworkers v. United States Gypsum Co.*, 492 F.2d 713, 734 (5th Cir.) ("the purpose of [section] 302(a) is to protect employers from extortion and to insure honest

uninfluenced representation of employees"), *cert. denied*, 419 U.S. 998, 95 S.Ct. 312, 42 L.Ed.2d 271 (1974).

7.28 The general prohibition is subject to express statutory exceptions set forth in section 302(c) of the Act, 29 U.S.C. § 186(c). Congress did not intend that the general prohibition prevent a union or employee representative from vindicating its legal rights as to an employer, and thus enacted the settlement exception, section 302(c)(2), which exempts adjudicated awards and judgments, and also payments arising out of the voluntary settlement of claims and disputes, from the general prohibitions of the Act. The settlement exception specifically excludes:

> the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress.

29 U.S.C. § 186(c)(2).

7.29 None of the parties or objectors, including the Eagles, dispute that the licensing litigation settlement resolves a wide range of genuine legal controversies between the NFL and the NFLPA, in which substantial economic interests were at stake. The licensing cases were filed several years before any global settlement appeared to be possible, and were strenuously litigated by the NFLPA long before it again became the players' union.[76] For example, in one case the parties conducted approximately fifty depositions and extensive pretrial preparations. *See* Allen Supp.Decl. ¶¶ 9–11. The suits involved antitrust, tort, contract and other claims in nearly a dozen lawsuits all over the country, and sought injunctive relief against the NFL defendants, millions of dollars in treble damages and punitive damages of at least $10 million.

---

75. The court previously concluded that class counsel had no conflict in the present case as a result of any role in the licensing litigation, and that any alleged conflict had been rectified by class counsel's withdrawal from the representation of the NFLPA in the licensing litigation. *See*

*White*, 822 F.Supp. at 1405 n. 29, 1430 n. 68 (*citing* Quinn Supp.Aff. ¶¶ 38–39).

76. *See White*, 822 F.Supp. ¶ 4.13, at 1415–16 & n. 35 (detailing the licensing litigation).

It is also undisputed that there are legitimate claims between the NFLPA and the NFL concerning whether the NFLPA has a valid trademark for the "NFL Players" logo. Those claims put at issue the value of defendants' other intellectual property rights, which last year alone provided between $55–60 million in revenues. *See* Declaration of Neil Austrian ¶¶ 4–8 (July 2, 1993) ("Austrian Decl."). As part of the global settlement, the NFLPA has agreed to withdraw its pending application to register "NFL Players" as a trademark, an application that NFL Properties has opposed in a proceeding before the United States Patent and Trademark Office. The NFLPA has also agreed to refrain from marketing athletic wear bearing NFL team colors and city designations, for which the NFL was prepared to seek injunctive relief. *Id.* ¶ 9.

There is also no evidence of fraud or duress in the settlement process; and no reasonable view of the facts suggests any improper influence. Based on the foregoing, the court finds that the licensing litigation settlement resolves a wide range of legitimate disputes between the NFL and the NFLPA. The court further concludes that the settlement exception set forth in section 302(c)(2) clearly applies to any payments made to the NFLPA pursuant to the licensing litigation settlement because such consideration is to be paid "in compromise, adjustment, settlement, or release of" bona fide claims. 29 U.S.C. § 186(c)(2). Accordingly, the Eagles' contention that the payments constitute a violation of section 302 is without merit. *See, e.g., Washington Post v. Washington–Baltimore Newspaper Guild, Local 35*, 787 F.2d 604, 607 (D.C.Cir.1986).[77]

7.30 The Eagles' section 302 objection to the licensing settlement, and the corresponding amendment to the *White* Settlement Agreement, is premised on the contention that the value of the consideration flowing from the NFL defendants to the NFLPA is excessive; in essence, that the licensing settlement is a "bad deal" for the NFL. However, in the absence of fraud or duress, section 302(c)(2) does not require the court to examine the actual terms of a settlement of legitimate claims for purposes of determining whether such consideration is "fair."[78]

Moreover, even if it were required to assess the fairness of the exchange, the court rejects the Eagles' claim that the licensing settlement is excessive. In making this determination, the court relies on the declaration of Neil Austrian, President and Chief Operating Officer of the NFL, which describes the substantial benefits that the NFL believes that it has received in the licensing settlement,[79] and the declaration of Commissioner Paul Tagliabue, which states that Mr. Braman, the Eagles' owner, has made remarks indicating strong support of the terms of the proposed licensing settlement. *See* Austrian Decl. ¶¶ 8, 10–11; Declaration of Paul Tagliabue ¶ 39 (April 12, 1993); *see also* Allen Supp.Decl. ¶ 11 (setting forth benefits received by NFL in the settlement of the licensing litigation).

7.31 Finally, the court rejects various factual assertions underlying the Eagles' challenge under the federal labor laws. For example, the Eagles claim that the value of the group player licensing rights transferred to the NFLPA "may exceed $200 million", a statement based on the Eagles' belief that

---

77. The court also concludes that the sole case cited by the Eagles in support of their contention that the section 302(c)(2) exception does not apply, *International Longshoreman's Ass'n v. Seatrain Lines, Inc.*, 326 F.2d 916 (2d Cir.1964), is inapposite. That case held that the section 302(c)(2) exception did not apply to a payment that was made in response to a union's collective bargaining demands, and thus did not arise out of the settlement of a genuine claim or dispute concerning the parties' legal rights. *Id.* at 919–20.

78. The existence of a separate statutory exemption, set forth in section 302(c)(3), 29 U.S.C.

§ 186(c)(3), for payments arising out of the "sale or purchase of an article or commodity at the prevailing price in the regular course of business," suggests that the court is to scrutinize only those payments made pursuant to section 302(c)(3), not to the settlement exception set forth in section 302(c)(2), for the fairness of the exchange.

79. Thus, the payments to the NFLPA may also be exempt under the sale at fair market value exception set forth in section 302(c)(3), 29 U.S.C. § 186(c)(3).

"NFL player licensing is a ... $20 million per year business." The only evidence before the court indicates, however, that NFL Properties' group licensing business actually lost $5 million in the past fiscal year, 1992. Austrian Decl. ¶ 11.

The Eagles further assert that the NFL has agreed to make an outright payment of $35 million to the NFLPA over the seven-year term of the settlement. That assertion, however, mischaracterizes the terms of the parties' agreement, under which the NFL is to pay the NFLPA $10 million to settle the antitrust and business interference claims asserted in the New York licensing lawsuit. *See* Licensing Settlement Agreement ¶ 4 (May 6, 1993). Over the remaining years of the settlement agreement, the NFL will pay the NFLPA an additional sum of approximately $14.7 million. *Id.* ¶ 5. The NFL has also agreed to guarantee an additional amount, up to approximately $20.3 million over the course of the settlement agreement, in the event that the NFLPA does not earn that amount from the Pro–Line and Game Day licenses that have been assigned to it under the terms of the licensing settlement. *Id.* ¶ 12. If, however, the NFLPA earns the minimum revenues from the two card licenses, the NFL is not required to make any further payments. *Id.*

Accordingly, the court rejects the foregoing assertions of fact underlying the Eagles' federal labor law challenge.

■ 7.32 The Eagles also challenge the legality of the licensing settlement under the federal antitrust laws, contending that the NFL's agreement to limit its future role concerning player group licensing rights constitutes an illegal division of markets.

The court first rejects the Eagles' claim that the NFL has agreed to discontinue its player licensing business and "to stop competing with the NFLPA." Under the terms of the licensing settlement agreement, and pursuant to the definition of group player licensing rights in the new Collective Bargaining Agreement, the NFL, through NFL

Properties, remains free to license Quarterback Club members, individual players and groups of less than six players. Austrian Decl. ¶ 10; Collective Bargaining Agreement, art. V, § 4. The court thus concludes that the Eagles' "division of markets" claim is without factual foundation.

Even if the Eagles' factual allegations were true, the court finds that its antitrust challenge to the licensing settlement is fatally flawed. The NFL defendants' agreement to limit their ability, as employers, to individually negotiate with players for purposes of securing group licensing rights is expressly incorporated in the new Collective Bargaining Agreement. *See id.*[80] Although the legality of the Collective Bargaining Agreement is not directly before the court (except to the extent that provisions of the Collective Bargaining Agreement may incorporate the terms of the amended Settlement Agreement), the court notes that the Eagles' antitrust challenge would fail as a result of the application of the nonstatutory labor exemption. In *Mackey v. National Football League*, the Eighth Circuit determined that the nonstatutory labor exemption applies in the context of professional football to collectively bargained provisions that: (1) primarily affect the parties to the collective bargaining agreement; (2) concern a mandatory subject of collective bargaining; and (3) are the product of bona fide arm's length bargaining. 543 F.2d at 614.

Examining those factors, the court first finds that the provisions at issue primarily affect the parties to the Collective Bargaining Agreement. All NFL players may choose to opt out of the provisions that purport to assign their group licensing rights to the NFLPA by simply striking the applicable paragraph of their NFL player contracts. That opt-out right ensures that third parties remain entirely free to compete with the NFLPA for players' group licensing rights.

The court further concludes that the provisions concern a mandatory subject of collective bargaining because they "pertain" to "the terms or conditions of [players'] employ-

80. That limitation is also included in paragraph 4 of the collectively bargained NFL Player Contract.

ment" by limiting defendants' ability, as employers, to negotiate individually with players for certain of their publicity rights. *See id.* at 615.[81] The court also finds that the undisputed evidence, including the affidavits and declarations of the principals involved in negotiating the new Collective Bargaining Agreement, make clear that the challenged provisions were the product of bona fide arm's length negotiations. The court therefore concludes that the Eagles' antitrust challenge fails because the nonstatutory labor exemption protects defendants' agreement to limit their ability to individually negotiate with players for purposes of securing group licensing rights.

7.33 Finally, the court rejects the Eagles' request that the court postpone final approval of the amended Settlement Agreement in order to permit discovery. The court previously determined that:

class members have been provided with, or had available to them, more than adequate information with which to analyze the fairness and reasonableness of the [original] settlement.

*White,* 822 F.Supp. ¶ 7.18, at 1429. The court finds that class members have also been provided with, or had access to, adequate information with which to analyze the pending motions to approve the amended Settlement Agreement and for further factual findings. The court also concludes that the record reflects no evidence of collusion. *See id.* ¶ 2.19, at 1407; *White,* Transcript of Preliminary Approval Hearing for the Original Settlement Agreement at 82–84 (Feb. 26, 1993) (finding no evidence of collusion and concluding settlement was product of arm's length negotiations). Accordingly, the court denies any request to postpone final approval of the amended Settlement Agreement or the issuance of further findings to permit discovery. *See, e.g., In re Domestic Air Transp. Antitrust Litig.,* 144 F.R.D. 421, 424 (N.D.Ga.1992) (absent evidence of collusion, objectors have no right to seek discovery

concerning the negotiations of a class action settlement) (citing *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.,* 834 F.2d 677, 684 (7th Cir.1987)).

7.34 After carefully considering all of the objections to the amended Settlement Agreement, the court finds that it provides even greater benefits to class members than the original Settlement Agreement. Accordingly, the court concludes that the amended Settlement Agreement is fair, reasonable and adequate to the class, and, for the reasons previously set forth, overrules all of the objections to the motions to amend the Settlement Agreement and to approve the amended Agreement.

7.35 Based on the foregoing, the court makes the following additional findings of fact and conclusions of law:

(a) The terms of the amended Stipulation and Settlement Agreement fundamentally modify the NFL's rules, policies and practices regarding veteran player movement and employment. The settlement also fundamentally modifies by agreement the college draft, the NFL Player Contract, and various other terms and conditions of NFL player employment.

(b) The revised player mobility and employment rules represent a successful effort by NFL players to eliminate Plan B, and to bring about substantial modifications in the principles relating to veteran player transfers.

(c) Under Eighth Circuit law, when evaluating the amended Settlement Agreement, it is unnecessary for the court to determine whether every provision of the settlement, if adopted outside a settlement context and made subject to a trial on the merits, would be deemed reasonable after a full rule of reason inquiry. In fact, the court should not make such inquiry.

(d) The amended Settlement Agreement, as a whole, is not *per se* illegal.

---

**81.** Defendants also request that the court find that the players' licensing rights "are an emolument of NFL employment". Plaintiffs oppose that request. (Letter from Jeffrey L. Kessler to the court dated July 20, 1993). The court concludes that such a finding is unnecessary for purposes of determining whether the nonstatutory labor exemption applies to the provisions in the Collective Bargaining Agreement concerning players' licensing rights, and thus declines to make any ruling on that issue.

(e) The settlement of the licensing litigation does not constitute an agreement not to compete in violation of the antitrust laws.

(f) The provisions of the new Collective Bargaining Agreement related to group player licensing are exempt from antitrust scrutiny during the express term of the Collective Bargaining Agreement pursuant to the nonstatutory labor exemption.

(g) Transfers that are made to the NFLPA pursuant to the settlement of the licensing litigation do not violate section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, because such transfers are made in "compromise, adjustment, settlement, or release of" bona fide claims, and thus are exempt from the application of that statute. *See* 29 U.S.C. § 186(c)(2).

## VIII. MOTIONS TO INTERVENE

8.1 The court incorporates all of the findings set forth in its April 30, 1993, order concerning the various motions to intervene, and makes the following additional findings.

8.2 Various objectors contend that the court's partial grant of various motions to intervene in its order of April 30, 1993, constitutes an implicit finding that the named plaintiffs inadequately represent absent class members. (*See* Letter from Robert A. Brunig to the court dated April 30, 1993). Because its determination is not the final word on the propriety of the present settlement, the court partially granted various motions to intervene solely for the purpose of providing certain objectors with the right to appeal.[82] The Eighth Circuit has expressly adopted that approach to permit all actions to be consolidated in one case. *See Croyden Assocs. v. Alleco, Inc.*, 969 F.2d 675, 678–80 (8th Cir.1992) (unnamed class member must move to intervene in order to preserve right to

appeal), *cert. denied,* —— U.S. ——, 113 S.Ct. 1251, 122 L.Ed.2d 650 (1993). The court's decision to partially grant certain motions to intervene does not indicate any ruling concerning the adequacy of representation or the validity of any objections, but merely serves as a mechanism to promote judicial economy by channeling all objections to one appellate court. *See id.*

8.3 Accordingly, the court rejects those arguments concerning the motions to intervene, and reaffirms its determination that the named plaintiffs and class counsel adequately represent the entire class. *See supra* § II; *White,* 822 F.Supp. ¶¶ 2.12–2.21, at 1404–07.

## IX. DEFENDANTS' MOTIONS TO ENJOIN OTHER ACTIONS

9.1 The court incorporates all of the findings set forth in its order of April 30, 1993, with respect to all matters involving defendants' motions to enjoin various other actions. *Id.* § IX, at 1433–35.

## X. THE MOTION FOR FURTHER FACTUAL FINDINGS CONCERNING THE APPLICATION OF THE NONSTATUTORY LABOR EXEMPTION AND THE FORMATION OF THE NFLPA AS THE EXCLUSIVE COLLECTIVE BARGAINING REPRESENTATIVE OF THE NFL PLAYERS

In its order of April 30, 1993, the court made the following findings concerning the NFLPA:[83]

10.1 On January 6, 1993, the parties reached an agreement in principle to settle the present class action, as well as various other related litigation.

> However, none of the movants shall be considered named "plaintiffs" under the terms of the Stipulation and Settlement Agreement, none of the complaints in intervention shall be filed, and the named parties need not answer or otherwise respond to any of the complaints in intervention.
> *White,* 822 F.Supp. ¶ 8.1, at 1432 (citations and footnotes omitted).

---

82. The order of April 30, 1993 specifically provided that:

> the court denies all motions to intervene except to the extent that the movants, other than Mr. Sheridan and the *Tice* plaintiffs, shall be permitted to intervene as "intervenor-objectors" solely for purposes of preserving their rights to appeal any judgment entered by the court in connection with the Stipulation and Settlement Agreement.

83. *See White,* 822 F.Supp. ¶¶ 10.1–10.6, at 1435.

10.2 After an agreement in principle was reached on January 6, 1993, and after a vote of the Board of the NFLPA to seek to become the collective bargaining representative for the players, the NFLPA began to collect authorization cards from NFL players designating it as the exclusive collective bargaining representative of all present and future NFL players.

10.3 By letter dated March 23, 1993, Richard A. Berthelsen, General Counsel of the NFLPA, informed Commissioner Paul Tagliabue that "[a] majority of the players on 1992 season-ending rosters have now signed cards authorizing the NFLPA to represent them for the purposes of collective bargaining."

10.4 In accordance with an agreement between the NFLPA and the NFL, dated March 24, 1993, the American Arbitration Association conducted a check-off of signed cards of interest against the 1992 season-ending rosters. By letter of March 26, 1993, the American Arbitration Association reported that 873 cards had been duly executed and returned by eligible voters, thus reestablishing the majority standing of the NFLPA.

10.5 Based upon the evidence verified by the American Arbitration Association that a majority of NFL players have recognized the NFLPA as their exclusive bargaining representative, the NFL voluntarily recognized the NFLPA as the sole and exclusive collective bargaining representative of present and future employee players in the NFL, as set forth in the previous NLRB Certification # 18–RC–8308, dated January 22, 1971. (*See* Letter from Harold Henderson, Executive Vice President for Labor Relations and Chairman of the NFL Management Council, to Eugene Upshaw, Executive Director of the NFLPA, dated March 29, 1993).

10.6 Based on the representations and sworn testimony of the parties, it appears that at all times during this process, the NFLPA maintained that it would not accept any assistance from either the NFL, or any of its member clubs. Nor did the NFL, or any of its member clubs, take any action which either hindered or supported the for-

mation of the NFLPA as the exclusive collective bargaining representative of all present and future NFL players.

10.7 Relying on the foregoing, the court reached the following conclusions concerning the NFLPA in the April 30, 1993 order: [84]

(a) The NFLPA has been lawfully formed and selected by the players to serve as the exclusive collective bargaining representative of all present and future NFL players.

(b) Neither the NFL nor any of its members have taken any action which in any way hindered or supported the formation of the NFLPA as the exclusive collective bargaining representative of all present and future NFL players.

(c) The NFL and its member clubs have lawfully recognized the NFLPA as the players' exclusive collective bargaining representative.

(d) Accordingly, the NFLPA is fully authorized and empowered to enter into a new collective bargaining agreement with the NFL and its member clubs.

10.8 The court incorporates the foregoing findings concerning the NFLPA, and supplements them as follows.

10.9 On March 31, 1993, two days after the NFL officially recognized the NFLPA as the exclusive bargaining representative of all present and future NFL players, representatives of the NFL Management Council and the NFLPA began to meet in an effort to negotiate a new collective bargaining agreement between players and the NFL member clubs. Those meetings continued almost daily until May 6, 1993, at which time the parties reached agreement on the terms of a new collective bargaining agreement.

10.10 Relying on the representations and sworn testimony of the parties, the court finds that the collective bargaining negotiations encompassed a wide range of matters relating to the terms and conditions of NFL player employment. The new Collective Bargaining Agreement incorporates, almost verbatim, all of the system-related provisions set forth in the Stipulation and Settlement Agreement. However, some of those provi-

84. *See White,* 822 F.Supp. ¶ 10.7, 1435–36.

sions were modified during the negotiation process. The court concludes that those modifications are strong evidence that the systems-related provisions were the subject of hard bargaining, and are the product of the give-and-take inherent in such negotiations.[85]

The court has previously recognized that, given the long history of acrimony and 'disagreement between the NFL and its players concerning the player employment rules at issue here, any accord could only have resulted from long and difficult negotiations, conducted in good faith and at arm's length. *White*, 822 F.Supp. ¶ 6.13, at 1421. The court finds that this determination is equally true in the collective bargaining context, where the representatives of the NFL and NFLPA have expressly agreed to incorporate those systems-related provisions in the new Collective Bargaining Agreement.

10.11 Certain objectors allege that the NFLPA cannot be deemed the valid collective bargaining representative of the NFL players because it engaged in collective bargaining before it was reconstituted as a union and recognized by the NFL Management Council as the players' collective bargaining representative.

The court previously determined that the NFLPA's participation in the settlement negotiations as a consultant to class counsel was proper.[86] Based on the evidence in the record, the court further finds that the parties did not engage in any collective bargaining prior to the NFLPA's reformation as a union, and that the objectors present no credible arguments or evidence to the contrary. *See* Allen Supp.Decl. ¶¶ 4–8; Declaration of James W. Quinn ¶ 9 & Exh. A (July 2, 1993) (hereinafter "Quinn Decl."); Declaration of Harold Henderson ¶¶ 3–4 (June 29, 1993).[87] The court therefore overrules all such objections.

10.12 Having reached agreement on a new collective bargaining agreement, the parties have moved the court, pursuant to the requirements of the Stipulation and Settlement Agreement,[88] for findings concerning the applicability of the nonstatutory labor exemption to those terms of the amended Settlement Agreement that have been expressly incorporated in the new Collective Bargaining Agreement.

10.13 Various objectors initially opposed such findings, contending that they would constitute an advisory opinion. The court rejected those contentions in its order of

85. As previously discussed, the Settlement Agreement had to be amended to reflect those changes.

86. This court, in *McNeil*, and the Associate General Counsel of the NLRB have both determined that by sponsoring various lawsuits, the NFLPA was not thereby acting as the players' collective bargaining representative. *See Powell v. National Football League*, 764 F.Supp. 1351 (D.Minn. 1991) (in *McNeil*, rejecting without discussing defendants' claim that the NFLPA continued to function as a union because it was funding various lawsuits); *see* Defs.' Mem.Opp'n Pls.' Mot.Partial Summ.J. at 10 (Oct. 26, 1990) (raising that contention); *Pittsburgh Steelers, Inc.*, No. 6–CA–23143, 1991 WL 144468 (June 26, 1991).

Accordingly, the court previously concluded that:

Where it was appropriate for the NFLPA to finance the prosecution of antitrust litigation challenging terms and conditions of employment, the court finds that the NFLPA's role as consultant to class counsel in settling the same litigation is also lawful and appropriate.

*White*, 822 F.Supp. ¶ 7.23, at 1430–31.

The court further concluded that the NFLPA's role in the present class action did not constitute

improper inducement to union formation. *Id.* ¶ 7.24 at 1431; *see Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142 (4th Cir.) (case in which union used litigation as a method by which to organize employees), *cert. denied*, — U.S. —, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *cf. Pittsburgh Steelers, Inc.*, No. 6–CA–23143, 1991 WL 144468, at *4 n. 8 (June 26, 1991) (as long as NFLPA's disclaimer of its union status was "otherwise unequivocal and adhered to", it was irrelevant that the disclaimer "was motivated by 'litigation strategy,' i.e., to deprive the NFL of a defense to players' antitrust suits").

87. Moreover, the Eagles' assertion that the settlement discussions constitute collective bargaining may be a willful breach of numerous agreements entered into on behalf of all of the NFL defendants, including the Eagles, promising that the NFL defendants would not attempt to mischaracterize any settlement discussions as collective bargaining. *See* Quinn Decl. ¶¶ 2–9, Exhs. A, B & C.

88. *See* Stipulation and Settlement Agreement art. II, at 19 (original version dated Feb. 26, 1993); Stipulation and Settlement Agreement art. II, at 19 (amended version dated May 6, 1993).

April 30, 1993, determining that such findings would not be advisory to the extent that the relevant terms were to be incorporated in a new collective bargaining agreement. *White,* 822 F.Supp. ¶ 7.25, at 1431. The court noted that a central issue in the present case, as in *McNeil* and *Powell,* is the applicability of the nonstatutory labor exemption to various NFL player rules. As part of the compromise of those issues, class counsel specifically agreed that the new rules would be protected by the labor exemption for the express term of any new collective bargaining agreement in which such rules were incorporated, and the Settlement Agreement reflected that compromise. *See* Stipulation and Settlement Agreement, art. II, at 19 (original version dated Feb. 26, 1993); Stipulation and Settlement Agreement art. II, at 19 (amended version dated May 6, 1993). The court therefore concluded that it would not be advisory for the court to determine, pursuant to a joint petition by the parties to the Settlement Agreement, that the labor exemption applied to the new player employment rules to the extent that they were incorporated in a new collective bargaining agreement, and for the express term thereof. *White,* 822 F.Supp. ¶ 7.25, at 1431 (citing *Jensen v. United States,* 743 F.Supp. 1091, 1103 (D.N.J.1990) (court's decision was not advisory where settlement agreement provided for a judicial determination of the constitutionality of certain agency procedures)).

10.14 Now that a new Collective Bargaining Agreement has been reached incorporating various terms of the amended Settlement Agreement, some objectors reassert those arguments. The requested labor exemption findings will effectuate a primary goal of the present settlement, labor and litigation peace throughout the term of the Settlement Agreement, and will clearly impact both class members and the parties to the Settlement

Agreement. Accordingly, the court reaffirms its prior ruling that the labor exemption findings do not constitute an advisory opinion. *Cf. City of New York v. Exxon Corp.,* 697 F.Supp. 677, 681 (S.D.N.Y.1988) (in the context of approving a settlement, court could properly rule on the application of a provision of CERCLA to the case where that issue "would certainly have a substantial bearing on [non-settling] defendants' litigation strategy").

10.15 The court also reaffirms its determination that the labor exemption findings do not constitute an improper waiver of any class member's rights. *White,* 822 F.Supp. ¶ 7.26, at 1431 (citing *Alexander,* 1977–2 Trade Cas. (CCH) ¶ 61,730, at 72,991, 1977 WL 1497, at *9 ("[a]ny settlement or consent order would have had to deal with future rules in order to afford appropriate relief to plaintiffs and to be acceptable to the defendants")).

■ 10.16 The court further concludes that, in the present context, findings with respect to the reconstitution and recognition of the NFLPA as the players' union are not within the primary jurisdiction of the NLRB. The nonstatutory labor exemption is a judicially created doctrine,[89] and the definition of its scope and application must be made by the federal courts, not the NLRB. In order to determine whether the nonstatutory labor exemption applies to the provisions of the Settlement Agreement that have been incorporated into the new Collective Bargaining Agreement, the court must make preliminary findings that the Collective Bargaining Agreement has been negotiated at arm's length by a valid collective bargaining representative, and that the terms of the agreement are mandatory subjects of collective bargaining. In *McNeil,* the court held that the nonstatutory labor exemption had ended because the NFLPA was no longer a union,

**89.** *See, e.g., Mackey,* 543 F.2d at 614 (construing Supreme Court precedent and applying nonstatutory labor exemption to a dispute between players and the NFL concerning the Rozelle Rule); *see generally* Jonathan S. Shapiro, Note, *Warming the Bench: The Nonstatutory Labor Exemption in the National Football League,* 61 Fordham L.Rev. 1203, 1205–08 (1993) (discussing the history of the nonstatutory labor exemption and

noting that "[t]wo strands of federal labor law are braided into the judicially created nonstatutory exemption: the protection of unions from antitrust actions by the Clayton and Norris–LaGuardia Acts and the congressional policy to promote collective bargaining as expressed in the National Labor Relations Act") (footnotes omitted).

thereby rejecting the NFL's argument that such a determination could only be made by the NLRB. *See Powell,* 764 F.Supp. at 1356–57 (holding only in *McNeil*). The court now finds that the NFLPA has been validly reconstituted as a union as a necessary predicate to its ruling on the applicability of the nonstatutory labor exemption. The court therefore rejects any claims that the findings concerning the nonstatutory labor exemption are within the NLRB's primary jurisdiction.

10.17 Based on the foregoing, the court grants the motion for further factual findings concerning the scope of the nonstatutory labor exemption, and makes the following findings.

■ 10.18 Under *Mackey,* the nonstatutory labor exemption immunizes collectively bargained provisions that: (1) primarily affect the parties to a collective bargaining agreement; (2) concern a mandatory subject of collective bargaining; and (3) are the product of bona fide arm's length bargaining. 543 F.2d at 614. Examining those factors, the court first finds that all of the provisions which are set forth in the amended Settlement Agreement and which have been incorporated in the new Collective Bargaining Agreement, including those relating to the College Draft, the Entering Player Pool, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, the Guaranteed League-wide Salary, the Salary Cap and Minimum Team Salary, are provisions that relate to wages, hours, and other terms and conditions of employment. *See* 29 U.S.C. § 159(a) (1988) (mandatory subjects of collective bargaining concern the "rates of pay, wages, hours of employment, or other conditions of employment"). Similar provisions have routinely been deemed mandatory subjects of collective bargaining affecting primarily the parties to a collective bargaining agreement. *See, e.g., Powell,* 930 F.2d at 1298–99 (first refusal/compensation system primarily affected only parties in the collective bargaining relationship and concerned a mandatory subject of collective bargaining); *Mackey,* 543 F.2d at 615–16 (finding that the Rozelle Rule met the first two requirements of the nonstatutory labor exemption test,

that is, the Rule primarily affected the parties to a collective bargaining agreement and was a mandatory subject of collective bargaining); *Zimmerman v. National Football League,* 632 F.Supp. 398, 403–06 (D.D.C. 1986) (applying *Mackey* test, and finding that supplemental draft was a mandatory subject of collective bargaining which affected primarily the parties to the collective bargaining relationship); *cf. Wood v. National Basketball Ass'n,* 809 F.2d 954, 962 (2d Cir.1987) (NBA draft and salary cap were mandatory subjects of collective bargaining affecting primarily the parties to the collective bargaining relationship). The court further concludes that the undisputed evidence, including the affidavits and declarations of the principals involved in negotiating the new Collective Bargaining Agreement, demonstrates that the provisions are the product of bona fide arm's length negotiations.

■ 10.19 Accordingly, the court makes the following additional findings:

(a) Those provisions of the new Collective Bargaining Agreement which embody all or a portion of the terms of the amended Settlement Agreement were bargained for in good faith.

(b) Those provisions are mandatory subjects of collective bargaining and affect primarily the parties to the Collective Bargaining Agreement.

(c) Adherence to those terms of the Collective Bargaining Agreement during the express term of the Collective Bargaining Agreement is protected by the nonstatutory labor exemption to the antitrust laws.

(d) The application, if any, of the nonstatutory labor exemption following expiration of the express term of the Collective Bargaining Agreement will be determined in accordance with Article XVIII, Paragraph 5 of the amended Settlement Agreement.

## XI. THE COURT HAS JURISDICTION OVER THE *WHITE* CLASS

11.1 Various objectors again dispute the court's exercise of jurisdiction over absent, nonresident class members. The court overrules those objections, and reaffirms its prior determination that it has appropriate juris-

diction to properly adjudicate the claims of all class members, including those of absent, nonresident class members.

11.2 In making this determination, the court relies on its findings that the *White* settlement class was properly certified as a mandatory class pursuant to Federal Rule of Civil Procedure 23(b)(1), and that due process does not require that absent class members be provided with a right to opt out of the *White* class. *See supra* §§ II–III, *White*, 822 F.Supp. §§ II–III, at 1402–12.

The court further relies on its jurisdiction to enjoin various other actions pursuant to the All–Writs Act, 28 U.S.C. § 1651.[90] *Id.* ¶ 9.3, at 1433–35; *see, e.g., Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183–84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952) (federal courts have "an ample degree of discretion" in determining how best to administer "multiple litigation in the federal judicial system", and such discretion includes the power to stay pending federal court actions); *In re Joint Eastern & Southern District Asbestos Litig. (Eagle–Picher)*, 134 F.R.D. 32, 37 (E.D.N.Y. & S.D.N.Y.1990) (under the All–Writs Act, courts have jurisdiction "to certify a national class action and to stay pending federal and state cases brought on behalf of class members"); *In re State of South Dakota*, 692 F.2d 1158, 1162 n. 8 (8th Cir.1982) ("jurisdictional considerations under the All–Writs Act have been expanded beyond the technical notions of personal and subject matter jurisdiction"); *Robertson v. National Basketball Ass'n*, 413 F.Supp. 88, 90 (S.D.N.Y.1976) (enjoining sep-

arate federal lawsuit filed by an individual class member in order to protect "the jurisdiction of this court to determine this action, either by trial or by court-approved settlement"); *cf. In re Baldwin United Corp.*, 770 F.2d 328, 337 (2d Cir.1985) ("the need to enjoin conflicting ... proceedings arises because the jurisdiction of a multidistrict court is 'analogous to that of a court in an in *rem* action or in a school desegregation case, where it is intolerable to have conflicting orders from different courts'") (quotation omitted); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 882 (11th Cir.1989) (it "makes sense to consider this case, involving years of litigation and mountains of paperwork, as similar to a *res* to be administered").

11.3 In its order of April 30, 1993, the court also found that various objectors had:

> submitted to the court's jurisdiction because they have not confined their arguments to the claim that they are beyond the court's jurisdiction, but rather have objected to the merits of the proposed settlement.

*White*, 822 F.Supp. ¶ 8.1, at 1432; *see Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 787 (5th Cir.1990) (concluding that intervenors had waived any objection to personal jurisdiction when their arguments went "to the heart of the issue before the district court").[91]

11.4 Those objectors continue to argue, however, that they have not submitted to the court's jurisdiction. The court reaffirms its

90. That Act provides in relevant part that:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651(a).

In the order of April 30, 1993, that court noted that pursuant to the All–Writs Act:

> there is ample authority for the proposition that the court has jurisdiction to enjoin other actions even if the parties were not members of the *White* class.

*White*, 822 F.Supp. ¶ 9.3, at 1434; *see, e.g., United States v. New York Tel. Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) ("[the power conferred by the [All–Writs] Act extends, under appropriate circumstances, to persons

who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order"); *In re Baldwin United Corp.*, 770 F.2d 328, 338 (2d Cir.1985) ("[a]n important feature of the All–Writs Act is its grant of authority to enjoin and bind nonparties to an action when needed to preserve the court's ability to reach and enforce its decision in a case over which it has proper jurisdiction") (citations omitted).

The court therefore rejected any claim that the motions to enjoin must be denied because it lacked personal jurisdiction over any party. *White*, 822 F.Supp. ¶ 9.3, at 1434.

91. The court therefore denied "their motions to intervene to the extent that those players [sought] to reserve their jurisdictional defenses." *Id.* ¶ 8.1, at 1432–33.

determination that it has personal jurisdiction over the following objectors because they have knowingly and voluntarily submitted to this court's jurisdiction: Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith, Van Waiters, Broderick Thompson and Jerry Ball. In making this determination, the court relies on the following acts:

(1) a personal appearance through counsel at the April 16, 1993, hearing to argue in opposition to the court's approval of the original Stipulation and Settlement Agreement on the merits of that Agreement;[92]

(2) at that same hearing, offering live testimony and cross-examining witnesses concerning the merits of the proposed settlement;[93] and

(3) the filing of numerous memoranda of law concerning the settlement's purported inadequacies,[94] motions to intervene, an expert affidavit setting forth the estimates of their own damages expert, and proposed

findings of fact and conclusions of law which clearly address not only various jurisdictional issues, but also the merits of the proposed settlement.[95]

*See, e.g., Yeldell v. Tutt,* 913 F.2d 533, 538–39 (8th Cir.1990) (allegation of jurisdictional defect raised in answer was insufficient to preserve jurisdictional defense where party actively participated in discovery, filed various motions, participated in a five-day trial, and filed post-trial motions); *In re Real Estate Title & Settlement Servs. Antitrust Litig.,* 869 F.2d 760, 771 (3d Cir.) (noting that in the context of a mandatory class action "a party should be deemed to consent to personal jurisdiction if it actually litigates the adequacy of representation issue before the district court, or the underlying merits of the class action, because in such a case the party has shown a willingness to engage in extensive litigation in the forum")[96], *cert. denied,* 493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989); *Network Professionals, Inc. v. Network Int'l Ltd.,* 146 F.R.D. 179, 184 (D.Minn.1993) (even if defendants had properly raised jurisdic-

---

92. *See* Transcript of Final Fairness Hearing for the Original Settlement Agreement at 133–34 (Apr. 16, 1993) (argument of counsel that settlement is fundamentally flawed because of inadequate settlement payments to class members); *id.* at 404–05 (argument of counsel that Franchise Player provisions do "not have to be part of the settlement" and that "[t]here is no justification for disparities" in treatment between named plaintiffs and other class members who had filed suits).

93. *See* Transcript of Final Fairness Hearing for the Original Settlement Agreement at 219–27 (Apr. 16, 1993) (cross examination of class member Steve Jordan concerning merits of case, including fairness of proposed settlement and whether Reggie White adequately represented the class because he got "a deal that was different from a substantial number of the class members"); *id.* at 281–90 (testimony of objector Sean Jones which challenged fairness of settlement because named plaintiffs were to receive "more money").

94. For example, in a Memorandum Showing Cause Why Certain Cases Should Not Be Enjoined, dated March 18, 1993, those objectors state that they "do challenge the adequacy of the class representatives and the general and specific fairness of the settlement terms." That memorandum does not state that those players were appearing specially, or that they did not submit to this court's jurisdiction.

95. For example, in their proposed findings of fact and conclusions of law filed on July 14, 1993, those objectors claim that they have not consented to this court' jurisdiction, but nonetheless raise the following issues: (1) whether the settlement was negotiated in good faith; (2) alleged "conflicts of class counsel, class representative, and the NFLPA"; (3) the alleged inadequacy of representation by the NFLPA and class representatives "because of illegal and unfounded payments" under the settlement; (4) the alleged illegality of the Settlement Agreement because the NFLPA was not certified as the players' collective bargaining agent; and (5) the NFL's alleged interference with the players' right to choose a collective bargaining agent and their right to adequate representation by class representatives by improperly recognizing and negotiating with the NFLPA prior to certification.

96. Accordingly, the court rejects the contention that a waiver by active participation in the litigation of the merits should not apply in the context of a mandatory class action. Although subject to mandatory class certification, the foregoing players were nonetheless free to object solely on jurisdictional grounds or to assert their personal jurisdiction defense by motion. They chose instead to appear and litigate a broad range of issues going to the merits of the present action. *See supra* notes 92–95 (listing various issues concerning the merits of this case raised by those objectors).

tional defense in their answer, they clearly had waived the defense by actively participating in the lawsuit).

11.5 Accordingly, the court concludes that the foregoing players have affirmatively and voluntarily waived any and all of the jurisdictional defenses that they may have had.

## XII. THE FILING OF APPEALS OF THE COURT'S ORDER OF APRIL 30, 1993 DOES NOT DIVEST THIS COURT OF JURISDICTION TO ENTERTAIN THE PRESENT MOTIONS

12.1 Various interlocutory appeals were filed from the court's order of April 30, 1993.[97] *White v. National Football League*, slip op. at 3 (D.Minn. June 2, 1993). At the hearing for preliminary approval on June 1, 1993, some of those objectors argued that the notices of interlocutory appeal deprive this court of jurisdiction over the pending matters.[98]

12.2 Although an appeal generally divests the district court of jurisdiction over the issues appealed, in *Board of Education v. State of Missouri*, the Eighth Circuit noted that the rule "is not absolute", and held that the district court properly exercised jurisdiction despite a pending appeal where the case required continuing district court supervision, the district court expressly retained jurisdiction, and new facts had developed requiring action by a district court. 936 F.2d

993, 995–96 (8th Cir.1991); *cf. id.* at 995 (where order is injunctive in nature, under some circumstances district court may retain jurisdiction to modify terms of injunction despite appeal).

12.3 As previously determined in the order of June 2, 1993, the court finds that the present action is the type of case that requires ongoing court supervision. *White*, slip op. at 3. In addition, the court has specifically retained "jurisdiction over this action to effectuate and enforce the terms of the injunctions and Stipulation and Settlement Agreement." *White*, 822 F.Supp. at 1437. The court further concludes that the pending motions have been properly brought pursuant to Federal Rule of Civil Procedure 23 and represent new developments that require action by this court.

Finally, on July 22, 1993, the Eighth Circuit dismissed all appeals from this court's order of April 30, 1993, "for lack of jurisdiction." *Marshall et al. v. National Football League*, Nos. 93–2475MN, 93–2551MN, 93–2562MN, 93–2563MN, 93–2570MN, 93–2574MN, 93–2578MN & 93–2588MN (consolidated opinion dated July 22, 1993).

12.4 Accordingly, the court concludes that it has jurisdiction to entertain the pending motions, and rejects the jurisdictional arguments premised on the filing of various appeals. *See Janousek v. Doyle*, 313 F.2d 916, 920–21 (8th Cir.1963) (per curiam) ("an appeal from an interlocutory order does not divest the trial court of jurisdiction to contin-

---

**97.** The court never entered judgment on the order of April 30, 1993. Appeals of that order were filed on behalf of: (1) Wilber Marshall; (2) Paul Gruber; (3) Byron Evans; (4) Maurice Hurst and John Fourcade; (5) Carl Lee, Mark Dusbabek, Audray McMillian, Felix Wright, Cody Risien, Mark Harper, Sammy Martin, Don Beebe and Gregory Scales; (6) Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouvcia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever; (7) Sean Jones, Eric Allen, Leslie O'Neal, Eric Sanders, Ken Norton, Jr., Curtis Duncan, Patrick Hunter, William C. Matthews, Cris Dishman, Lomas Brown, Neil Smith,

Van Waiters, Broderick Thompson and Jerry Ball; and (8) the Philadelphia Eagles.

**98.** The order of June 2, 1993 stated that:

· As a result of the filing of appeals of the court's order of April 30, 1993, various other players object to the court's jurisdiction, specifically Terry Orr, Shane Collins, Ron Middleton, Mark Schlereth, Kelly Goodburn, David Gulledge, Ed Simmons, Matt Elliott, Joe Jacoby, Sidney Johnson, Kurt Gouvcia, Ravin Caldwell, Mark Rypien, James Jenkins, Johnny Thomas, Eric Williams, Don Warren, Jeff Bostic, Todd Bowles, Ray Brown, Jason Buck, Earnest A. Byner, Desmond Howard, Anthony Johnson, Brian Mitchell, Ricky Sanders and Paul Siever.

*White*, slip op. at 5 n. 5 (June 2, 1993) (citing Letter from Robert A. Brunig to the court dated May 28, 1993).

ue with other phases of the case") (quotation omitted).

## XIII. MOTION FOR SANCTIONS AGAINST THE PHILADELPHIA EAGLES

13.1 In its April 30, 1993 order, the court declined to sanction the Philadelphia Eagles despite its concern over "the Eagles' apparent disregard of the court's order of February 26, 1993, and the implausibility of the objections raised." *White*, 822 F.Supp. ¶ 7.28, at 1431.

13.2 Plaintiffs again ask the court to sanction the Eagles. Although troubled by the Eagles' actions for the same reasons previously set forth in its order of April 30, 1993, the court denies the motion to sanction the Eagles.

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. The motion to amend the Stipulation and Settlement Agreement is granted;

2. The motion to approve the Stipulation and Settlement Agreement, as amended, is granted, and the court grants final approval of the amended version of the Stipulation and Settlement Agreement;

3. The motion for further factual findings is granted; and

4. Plaintiffs' motion to sanction the Philadelphia Eagles is denied.